**LEHRNER, Exr., Appellee,**

v.

**SAFECO INSURANCE/AMERICAN STATES INSURANCE
COMPANY et al., Appellants.**

[Cite as *Lehrner v. Safeco Ins./Am. States Ins.
Co.,* 171 Ohio App.3d 570, 2007-Ohio-795.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 21324 and 21325.

Decided Feb. 23, 2007.

572

574

James W. Kelleher, for appellee and cross-appellant.

Scott G. Oxley, for appellant Safeco/American States Insurance Company.

Alexander M. Andrews, for appellant Utica Insurance Company.

Chris C. Tsitouris, for appellees Michael and Sharon Herbert.

Frederic L. Young, for appellees Michael and Sharon Herbert, d.b.a. Lavello's Pizza.

BROGAN, Judge.

{¶ 1} This litigation stems from an automobile accident in which Howard Jock, an employee of Lavello's Pizza, experienced a seizure while making a delivery and struck two elderly pedestrians, Ann and Leon Lehrner. At the time of the accident, the Lehrners were walking to their car from Don's Pawn Shop, a family-owned business that they operated with their son, Harvey. Although Ann Lehrner recovered from her injuries, Leon Lehrner died as a result of the accident.

{¶ 2} On March 28, 2000, Ann Lehrner and Harvey Lehrner, acting as executor of the estate of Leon Lehrner, filed a lawsuit against Jock and the owners of Lavello's Pizza, Michael and Sharon Herbert. The complaint included causes of action for wrongful death, conscious pain and suffering, and personal injury to Ann Lehrner. The complaint sought to hold the Herberts liable on the basis of respondeat superior. The Lehrners' lawsuit also named their own insurer, Safeco/American States Insurance Company ("Safeco"), as a defendant for purposes of obtaining underinsured-motorist coverage. The Lehrners later amended

their complaint to add a claim against the Herberts for negligent hiring, supervision, and retention of Jock.

{¶ 3} In addition to the primary action filed by the Lehrners, the Herberts filed a third-party complaint against Utica First Insurance Company ("Utica"), seeking a declaration of coverage for the Lehrners' claims against them under a Utica business-owners' liability policy that they had purchased. Utica responded with a counterclaim against the Herberts, seeking a declaration that the policy it had issued to the Herberts provided no coverage for the Lehrners' claims. For its part, Safeco also sought a declaration that Utica did owe coverage to the Herberts.

{¶ 4} In resolving cross-motions for summary judgment filed by Utica and Safeco, the trial court ruled on June 29, 2001, that the claim of negligent hiring, supervision, and retention against the Herberts was "permitted within the insurance policy issued by Utica to the Herberts." Therefore, the trial court found that Utica had a duty to defend the Herberts on all claims against them. The trial court indicated that its ruling was limited "to the issue of whether Utica must provide insurance coverage, defend and/or indemnify their insured." The trial court expressed its conclusion on this issue as being "in the affirmative."

{¶ 5} In response to a later motion by Utica, the trial court clarified the foregoing ruling. In a January 9, 2002 entry, it ruled as follows:

{¶ 6} "The commercial general liability policy issued to the Herberts for Lavello's specifically excludes coverage for bodily injury which arose from the automobile accident. The facts in this matter are that the Lehrners were injured as a result of an automobile driven by Jock. Clearly, this is the exact scenario that the policy was intending to exclude. The Herberts have misinterpreted the Court's Decision of June 29, 2001, to mean that since Utica was ordered to defend, there is automatic coverage under the policy. This is inaccurate."

{¶ 7} The trial court then bifurcated the proceedings into liability and damages phases. At the conclusion of a May 2002 liability trial, a jury found Jock liable to the Lehrners. The jury also found the Herberts liable to the Lehrners for Jock's negligence through respondeat superior. Finally, the jury found the Herberts liable to the Lehrners for negligent hiring, supervision, and retention of Jock. Following the liability trial, the Lehrners settled with Jock for his $25,000 automobile liability policy limit.

{¶ 8} After the liability phase, the trial court filed findings of fact and conclusions of law on January 15, 2003, addressing the obligations of Utica and Safeco under their insurance policies. The trial court ruled as follows:

{¶ 9} "1. On July 23, 1998, Utica First Insurance Company insured Michael and Sharon Herbert, both individually and doing business as Lavello's Pizza, under a

commercial liability policy with $1,000,000 in coverage for each occurrence and $2,000,000 in coverage in the aggregate;

{¶ 10} "2. The Utica First Insurance policy issued to Michael and Sharon Herbert and Lavello's Pizza provides coverage for the negligence of Michael and Sharon Herbert in hiring, supervising and retaining Howard Jock as an employee of Michael and Sharon Herbert, and doing business as Lavello's Pizza at all times material to this matter and specifically on July 23, 1998, and said negligence is a cause of the personal injury to Ann Lehrner and the death of Leon Lehrner;

{¶ 11} "3. Utica First Insurance Company must indemnify both Michael and Sharon Herbert, both individually and doing business as Lavello's Pizza, for Michael Herbert's negligent hiring, retention and supervision of Howard Jock, as well as Sharon Herbert's negligent hiring, retention and supervision of Howard Jock;

{¶ 12} "4. That Michael Herbert and Sharon Herbert are uninsured for purposes of respondeat superior claims;

{¶ 13} "5. That Howard Jock is underinsured;

{¶ 14} "6. That the limits of the Utica First policy are not required to be exhausted prior to the triggering of UM/UIM coverage available under the Safeco/American States policies listed below;

{¶ 15} "7. Safeco/American States issued four policies of insurance to Leon and Ann Lehrner and/or the business known as Don's Pawn Shop. The Court further finds that the Plaintiffs have available to them UM/UIM coverage under said policies in the following amounts:

| | | |
|---|---|---|
| a. | Personal Auto Policy | $   500,000 |
| b. | Personal Umbrella | $1,000,000 |
| c. | Business Auto Policy | $   500,000 |
| d. | Business Umbrella | $1,000,000 ." |

{¶ 16} After the trial court made the foregoing findings, the matter then proceeded to a damages trial that concluded on January 28, 2003. A jury entered a verdict for the Lehrners in the amount of $838,403.47, with $772,687.71 of that amount going to Leon Lehrner's estate and $65,715.76 going to Ann Lehrner. The award included various components of damages. The jury awarded zero damages, however, for Ann Lehrner's loss of support from the reasonably expected earning capacity of Leon Lehrner.

{¶ 17} Following the jury's verdict, the Lehrners moved for prejudgment interest against Safeco and Utica and for a new trial on Ann Lehrner's damages claim for loss of support. On September 10, 2003, the trial court sustained the new-trial motion on the loss-of-support issue. In so doing, the trial court concluded that "[a] reasonable jury could not have concluded that Ann Lehrner

suffered no damage or loss from the reasonably expected earning capacity of Leon Lehrner." The trial court conducted the new trial on March 22 through 24, 2004. Following this trial, the jury again returned a verdict of zero damages for Ann Lehrner's loss of support from the reasonably expected earning capacity of Leon Lehrner. On April 7, 2004, the Lehrners moved for a judgment notwithstanding this verdict and for another new trial. The trial court overruled the motion on September 6, 2005, finding that the evidence was legally sufficient to support the jury's verdict, that there was no evidence of the verdict being influenced by passion or prejudice, that the verdict was not contrary to law, and that it could be reconciled with the evidence.

{¶ 18} In its September 6, 2005 ruling, the trial court also awarded the Lehrners prejudgment interest against Safeco under R.C. 1343.03(A) and (C). The trial court declined to award the Lehrners any prejudgment interest against Utica. Thereafter, on September 23, 2005, the trial court filed its final judgment entry in the case. It entered judgment in favor of the Lehrners "and against the Defendants, Safeco Insurance/American States Insurance Company, and against Michael and Sharon Herbert, jointly and severally, in the amount of the jury verdicts, which totaled $838,403.47, less the $25,000.00 paid by Progressive Insurance Company on behalf of Defendant Howard Jock." The trial court also ordered Safeco to pay prejudgment interest at the rate of ten percent per annum on the $838,403.47 jury verdict from the date of the accident to the date of the final judgment entry. The trial court determined that the prejudgment interest award totaled $601,123.78. The trial court then stated, "Defendant Safeco Insurance/American States Insurance Company is primarily responsible for the judgment due to Plaintiffs and Plaintiffs are not required to first collect on any judgment from any other tortfeasor or insurer in order to seek satisfaction of this judgment from Defendant Safeco Insurance/American States Insurance Company." The trial court also found that postjudgment interest would accrue against Safeco on the sum of $1,439,527.20, which represented the jury verdict plus the prejudgment interest award minus the $25,000 previously paid by Howard Jock's automobile liability insurer. Finally, the trial court found that postjudgment interest would accrue against the Herberts on the sum of $813,403.47, which was the amount of the jury verdict minus the $25,000 paid by Jock's automobile liability insurer.

{¶ 19} Utica filed a timely appeal in Montgomery App. No. 21324 from the trial court's September 23, 2005 final judgment entry and various earlier rulings. Safeco filed a similar timely appeal in Montgomery App. No. 21325. Both appeals included cross-appeals filed by the Lehrners, the Herberts, and/or Safeco. On November 14, 2005, we sua sponte consolidated Montgomery App. Nos. 21324 and 21325, both of which are now before this court for disposition.

{¶ 20} As a means of analysis, we will address each appeal and cross-appeal separately.

## I.  Direct Appeal by Utica

{¶ 21} Utica's sole assignment of error is as follows:

{¶ 22} "The trial court erred in holding that Utica's policy of commercial liability insurance issued to Michael and Sharon Herbert (d/b/a Lavello's Pizza) provided coverage for the Herberts' negligent hiring, supervision, and retention of Howard Jock where the policy expressly excluded coverage for injuries arising out of the operation, use, or supervision of an auto."

{¶ 23} In this assignment of error, Utica argues that its business-owners' policy unambiguously excludes coverage for the claim of negligent hiring, retention, and supervision brought against the Herberts.  It contends that the trial court erred in ruling otherwise and finding coverage to exist under the policy.[1]

{¶ 24} While generally providing property and liability coverage for the Herberts' pizza business, the Utica policy contains the following exclusion:

{¶ 25} "**We** do not pay for a loss if one or more of the following excluded events apply to the loss, regardless of other causes or events that contribute to or

---

1.  There is some confusion as to the trial court's various rulings concerning coverage under the Utica policy.  The trial court initially filed a June 29, 2001 entry, finding that the claim of negligent hiring, retention, and supervision was "permitted within the insurance policy issued by Utica to the Herberts" and holding that Utica had a duty to defend.  The trial court later filed a January 9, 2002, entry in which it clarified that its prior ruling was not intended to resolve the coverage issue.  In its January 9, 2002 ruling, the trial court also stated: "The commercial general liability policy issued to the Herberts for Lavello's specifically excludes coverage for bodily injury which arose from an automobile accident.  The facts in this matter are that the Lehrners were injured as a result of an automobile driven by Jock.  Clearly, this is the exact scenario that the policy was intending to exclude."  Thereafter, on January 15, 2003, the trial court determined that "[t]he Utica First Insurance policy issued to Michael and Sharon Herbert and Lavello's Pizza provides coverage for the negligence of Michael and Sharon Herbert in hiring, supervising and retaining Howard Jock as an employee * * *."  Ultimately, in its September 23, 2005 final judgment entry, the trial court failed to mention the issue of Utica's obligation with respect to the Lehrners' judgment and, instead, merely stated that Safeco was "primarily obligated" to pay it.  As a result of the various rulings regarding coverage under the Utica policy for the Lehrners' claim of negligent hiring, retention, and supervision, Utica has appealed from the trial court's determination that that coverage exists, while Safeco has appealed from the trial court's apparent finding in its final judgment entry that Utica is not obligated to pay the judgment.  For purposes of our analysis, we will presume when addressing Utica's appeal that the trial court did find coverage under the Utica policy issued to the Herberts.  Conversely, when reviewing Safeco's appeal, we will presume that the trial court did not find coverage under the Utica policy and therefore did not require Utica to pay the judgment obtained by the Lehrners.  By taking this approach, we will address each insurance company's arguments and, in so doing, make our own determination about whether coverage is available to the Herberts under the Utica policy and whether Utica is obligated to pay the Lehrners' judgment.

aggravate the loss, whether such causes or events caused the loss before, at the same time as, or

{¶ 26} after the excluded event.

{¶ 27} " \* \* \*

{¶ 28} "6. **We** do not pay for **bodily injury** or **property damage** that arises out of the ownership, operation, maintenance, use, occupancy, renting, loaning, entrusting, supervision, **loading or unloading** of:

{¶ 29} " \* \* \*

{¶ 30} "b. an **auto** \* \* \*."

{¶ 31} Upon review, we agree with Utica's position that the foregoing language unambiguously excludes coverage for the claim of negligent hiring, retention, and supervision brought against the Herberts. The policy denies coverage for a bodily injury arising out of the operation of an automobile. The bodily injury to the Lehrners arose out of Howard Jock's operation of an automobile. This is evident from the fact that he hit them with his car after suffering a seizure while making a pizza delivery. The Utica policy also denies coverage for a bodily injury arising out of the supervision of an automobile. Thus, even if it might be argued that the bodily injury to the Lehrners arose out of the Herberts' negligence in supervising Jock's use of a car to deliver pizza, the policy would deny coverage for the claim against the Herberts.

{¶ 32} In reaching this conclusion, we see no ambiguity in the policy's exclusionary language and, therefore, no basis for construing it against Utica. The only conceivable ambiguity involves the phrase "arises out of." In our view, however, this phrase is unambiguous. "Arise" means "[t]o originate; to stem (from)" or "[t]o result (from)." Black's Law Dictionary 115 (8th Ed.2004).[2] Therefore, the Utica policy does not pay for a bodily injury that originates, stems, or results from the operation or supervision of an automobile. The injury to the Lehrners did originate, stem, or result from the operation or supervision of Jock's automobile. We find no ambiguity.[3]

---

2. See also *Stickovich v. Cleveland* (2001), 143 Ohio App.3d 13, 37, 757 N.E.2d 50, ("This court has held that arising out of means 'flowing from' or 'having its origin in.' \* \* \* The term 'arising out of' has also been defined to mean 'originating from,' 'growing out of,' or 'flowing from.' \* \* \* The term 'arising out of' does not require that the conduct be the proximate cause of the injury, only that it be causally related").

3. Even if it might be argued that the phrase "arises out of" contains some ambiguity in the abstract, we see no reasonable interpretation of those words that would permit coverage under the facts of this case. Regardless of whether a hypothetical scenario might be envisioned in which the phrase would be ambiguous, the present case presents no such

{¶ 33} The focus of the inquiry in the present case must be on whether the injuries to the Lehrners arose out of the operation or supervision of a car, not on whether the Utica policy specifically excludes coverage for claims alleging negligent hiring, supervision, and retention liability. This is so because the Utica policy expressly excludes coverage for a bodily injury arising out of the operation or supervision of a car. The Herberts' own negligence may have been a proximate cause of the Lehrners' injuries, but that fact goes to the Herberts' underlying tort liability. It is not determinative of the coverage issue. To determine coverage, we look to the policy language itself, which excludes bodily injuries arising out of the operation or supervision of an automobile. For the reasons set forth above, we conclude that the exclusion bars coverage for the Lehrners' claim of negligent hiring, supervision, and retention against the Herberts.

{¶ 34} The concurrent-cause language of the Utica policy quoted above adds further support to our conclusion. Here the injury to the Lehrners arose out of Howard Jock's operation of a car. Under the policy exclusion discussed above, such an injury is excluded from coverage. The concurrent-cause language provides that this exclusion applies "regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events caused the loss before, at the same time as, or after the excluded event." Even assuming that the Herberts' negligent hiring, supervision, and retention were an otherwise-covered event that contributed to the Lehrners' injuries, the concurrent-cause language would preclude coverage because Jock's operation of an automobile, a concurrent cause, was an excluded event.

{¶ 35} Finally, even without regard to the concurrent-cause language, our own case law supports a determination that the Utica policy exclusion applies to the claim of negligent hiring, supervision, and retention against the Herberts. In *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.* (1998), 129 Ohio App.3d 45, 716 N.E.2d 1201, a physician committed malpractice while performing surgery on a number of patients. As a result, the patients filed lawsuits against the hospital where the surgeries had occurred. The lawsuits alleged that the hospital was liable for negligent credentialing of the physician. USF & G, the hospital's insurer, argued that the negligent-credentialing claims were excluded from coverage under general-liability policies it had issued to the hospital. The policies included a malpractice and professional-services exclusion that barred coverage for "bodily injury or property damage due to * * * the rendering of or

---

situation. The injury to the Lehrners did "arise out of" the operation or supervision of Howard Jock's car under any reasonable interpretation of those words.

failure to render * * * medical, surgical, dental, x-ray or nursing service or treatment." Id. at 51, 716 N.E.2d 1201.

{¶ 36} The insurer argued that the exclusion precluded coverage on the negligent-credentialing claims against the hospital because the patients' bodily injuries were due to the physician's rendering or failure to render medical or surgical service or treatment. In response, the hospital argued that the negligent-credentialing claims themselves were not barred from coverage under the exclusion. We rejected this argument. In so doing, we observed:

{¶ 37} " 'The nature of many liability insurance losses is such that it is almost always possible to theoretically separate the activity which was occurring at the time of the loss (driving, loading, treating patients, and so forth), from some related but antecedent or concurrent activity that arguably contributed to the loss (hiring, supervision, training, packaging, and so forth).' 7 Couch on Insurance (3 Ed.1997), 101–157, Section 101.60.

{¶ 38} "It is often the case that 'the activity which was occurring at the time of the loss' (e.g., treating patients) is excluded from coverage under the insurance policy in question, while the 'related but antecedent or concurrent activity that arguably contributed to the loss' (e.g., hiring, supervision, etc.) is not excluded. In such cases, courts will allow recovery under the policy where the preliminary or concurrent act of planning, supervising, etc. is 'independent' of the excluded cause. * * * Conversely, courts will disallow recovery where the preliminary or concurrent act contributing to the loss is not independent of the excluded cause. * * * The preliminary or concurrent act contributing to the loss is independent of the excluded cause only where the act (1) can provide the basis for a cause of action in and of itself and (2) does not require the occurrence of the excluded risk to make it actionable." Id., 129 Ohio App.3d at 51–52, 716 N.E.2d 1201, quoting 7 Couch on Insurance (3 Ed.1997) 101–157, Section 101.60.

{¶ 39} We next explained in *United States Fid. & Guar. Co.* why the negligent credentialing claims against the hospital were excluded from coverage:

{¶ 40} "Applying the foregoing to the case before us, we begin by noting that any injuries stemming from the surgical procedures performed by Dr. Burt are expressly excluded from coverage under paragraph 1(a) of the exclusionary clause in question. For purposes of this argument, we shall assume without deciding that losses caused by negligent credentialing are not excluded *per se* from coverage. Therefore, the question becomes whether SEMC's alleged negligent credentialing of Dr. Burt is 'independent' of the surgical procedures performed by Dr. Burt, for purposes of determining whether negligent credentialing constitutes a cause of loss independent from the excluded cause, i.e., the rendering of medical or surgical services or treatment.

{¶ 41} "While it is clear that a claim of negligent credentialing provides a basis for a cause of action in and of itself, * * * it is equally clear that no plaintiff can maintain a cause of action for negligent credentialing without demonstrating that his or her injuries were caused by some physician on the hospital's staff who rendered or failed to render medical services to the plaintiff. Thus, losses caused by negligent credentialing are not independent losses caused by the rendering or failure to render medical or surgical service or treatment. As a result, the claims brought against SEMC are excluded from the policies' coverage." Id., 129 Ohio App.3d at 52–53, 716 N.E.2d 1201.

{¶ 42} The parallel between *United States Fid. & Guar. Co.* and the present case is manifest. Negligent hiring, supervision, and retention can provide the basis for a cause of action in and of itself. However, plaintiffs such as the Lehrners cannot maintain such a claim without demonstrating that their injuries were caused by Jock's own negligent operation of an automobile. Indeed, a claim of negligent hiring, supervision, and retention against an employer is not viable without an underlying act of negligence by an employee that causes an injury or loss. The elements of a claim for negligent hiring, supervision, and retention are (1) the existence of an employment relationship, (2) the employee's incompetence, (3) the employer's knowledge of the employee's incompetence, (4) the employee's act or omission causing the plaintiff's injuries, and (5) a causal link between the employer's negligence in hiring, supervising, and retaining and the plaintiff's injuries. *Harmon v. GZK, Inc.* (Feb. 8, 2002), Montgomery App. No. 18672, 2002 WL 191598.

{¶ 43} As set forth above, Jock's negligent operation of a car is an excluded cause of injury under the Utica policy. But to prevail on a claim of negligent hiring, supervision, and retention against the Herberts, the Lehrners were required to prove, inter alia, that Jock's act or omission (i.e., operation of a car) caused their injuries. Therefore, any injury or loss to the Lehrners as a result of negligent hiring, supervision, and retention by the Herberts is not independent of the excluded cause, Jock's operation of an automobile, and is not covered under the Utica policy.

{¶ 44} In opposition to our reading of the Utica policy and our determination that it provides no coverage in this case, Safeco and the Herberts advance several arguments.[4] Most notably, they contend that our 1998 decision in *United States Fid. & Guar. Co.* is incompatible with the Ohio Supreme Court's more recent

---

4. These arguments are set forth and addressed by the parties in a number of briefs, including briefs opposing Utica's appeal, briefs supporting Safeco's cross-appeal, and a brief supporting the Herberts' cross-appeal. Because several of the briefs address the same arguments and incorporate one another by reference, we are reviewing all of them in connection with Utica's direct appeal.

ruling in *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 738 N.E.2d 1243. According to Safeco and the Herberts, *Shaffer* runs contrary to the rationale of *United States Fid. & Guar. Co.* and, in so doing, undercuts Utica's argument that we should look to the cause of injury, rather than the theory of liability, to determine whether coverage exists.

{¶ 45} Having reviewed *Shaffer,* we do not agree that it implicitly overruled or superseded our decision in *United States Fid. & Guar. Co.* The two rulings are not incompatible, because they address different issues. The issue before the Ohio Supreme Court in *Shaffer* was "whether the public policy precluding liability insurance coverage for acts of sexual molestation also prohibits coverage for a nonmolester for related claims alleging negligent supervision, negligent retention, and negligent failure to warn." *Shaffer,* 90 Ohio St.3d at 390, 738 N.E.2d 1243. *Shaffer* involved a suit against the operators of a nursing home for negligent supervision and retention of an employee who sexually abused a resident. In its opinion, the majority recognized that Ohio public policy forbids insurance coverage for the intentional tort of sexual molestation. The *Shaffer* court determined, however, that the same public policy did not prohibit coverage for a defendant who merely was negligent with regard to sexual abuse committed by another. Therefore, it held that "Ohio public policy permits a party to obtain liability insurance coverage for negligence related to sexual molestation when that party has not committed the act of sexual molestation." Id. at 395, 738 N.E.2d 1243.

{¶ 46} *Shaffer* addressed public policy, not policy language. The fact that public policy allows the purchase of insurance for negligence related to sexual molestation says nothing about whether the Utica policy exclusion applies in this case. *Shaffer* may support the proposition that public policy *permitted* the Herberts to obtain a liability policy for their own negligence related to Howard Jock's operation of an automobile, but they did not. In short, *Shaffer* holds that a nonmolester *may* be insured for acts of negligence related to molestation, but it does not hold that a nonmolester *must be* so insured or *is* so insured under a given policy. See *Allstate Ins. Co. v. Dolman,* Lucas App. Nos. L–05–1281, L–05–1290, 2006-Ohio-4134, 2006 WL 2320939, ¶ 24 ("*Shaffer* stands for the proposition that insuring against the negligence of a non-molester is not against public policy. The Ohio Supreme Court in *Shaffer* did not interpret the insured's policy language. It dealt only with the issue of whether public policy precludes coverage for a negligent, non-molesting party"). Because Utica relied on its policy language, not public policy, to deny coverage in this case, we are unpersuaded by Safeco's and the Herberts' citation of *Shaffer.*

{¶ 47} Safeco and the Herberts additionally assert that a claim for negligent hiring, supervision, and retention is based on an employer's direct liability, as opposed to respondeat superior, which is grounded in a theory of derivative

liability. While we do not necessarily dispute this distinction, the fact remains that a necessary element of a claim of negligent hiring, supervision, and retention is an act or omission by the employee causing injury or loss to a plaintiff. The act involved here was Howard Jock's negligent operation of an automobile. The Utica policy precludes coverage for injuries arising out of the operation of an automobile. As a result, the claim of negligent hiring, supervision, and retention is not covered under the Utica policy. *United States Fid. & Guar. Co.*, 129 Ohio App.3d at 52–53, 716 N.E.2d 1201.

{¶ 48} Safeco and the Herberts next argue that the Utica policy provides coverage because the Herberts' legal obligation to pay damages arises out of negligence in their employment relationship with Howard Jock and not from an automobile accident. In connection with this argument, Safeco and the Herberts contend that the Utica policy is "at best" ambiguous and, therefore, must be construed to provide coverage. They also cite several cases from other states to support their position. Based on the reasoning set forth in our analysis of the Utica policy, we are unpersuaded that it is ambiguous. For the reasons articulated above, we also do not agree that Jock's negligent operation of an automobile can be separated from the Herberts' negligent hiring, supervision, and retention for purposes of determining coverage under the Utica policy. With regard to the out-of-state cases cited by Safeco and the Herberts, they demonstrate only a split of opinion nationally. As noted by Utica, cases from other jurisdictions exist that support the conclusion we have reached herein. In a reply brief, Safeco itself admits that the cases it cites represent the minority view. For purposes of resolving the issue before us, however, we need to look no further than our own holding in *United States Fid. & Guar. Co.*, which we find to be dispositive, and the Ohio Supreme Court's ruling in *Shaffer*, which we find to be distinguishable.

{¶ 49} Safeco and the Herberts also maintain that a presumption of coverage should exist under the Utica policy because it does not specifically exclude claims of negligent hiring, supervision, and retention. Once again, we do not agree. Coverage under the Utica policy simply is not conditioned on whether the insured's *liability* (i.e., the Herberts' negligent hiring, etc.) arises out of the operation of an automobile. It is conditioned on whether the *injury or loss* (i.e., the injuries to the Lehrners) arises out of the operation of an automobile. Consequently, as we have explained above, the proper inquiry in this case is whether the Lehrners' injuries arose out of the operation of an automobile, not whether the theory of liability known as negligent hiring, supervision, and retention is specifically excluded by the Utica policy.

{¶ 50} We are equally unpersuaded by Safeco's and the Herberts' reliance on *Lock v. Oney's Pub* (Nov. 8, 1996), Montgomery App. No. 15577, 1996 WL 648357. *Lock* involved a bar fight between two patrons. The bar owner held a liability

insurance policy containing an exclusion for injury arising out of "the actual or threatened assault or battery or the failure to suppress or prevent such action by the insured or by anyone else for whom the insured is legally responsible." Upon review, we held that the exclusion was ambiguous as to whether it applied to an assault committed by a patron as opposed to a bar employee. Despite Safeco's and the Herberts' argument to the contrary, we see no similar ambiguity here. The Utica policy excludes coverage for injuries that arise out of the use, operation, or supervision of a car, period, without regard to who was driving the vehicle.

{¶ 51} Safeco and the Herberts next argue that a separation-of-insureds clause in the Utica policy compels a finding that coverage exists for the Lehrners' claim of negligent hiring, supervision, and retention. The separation-of-insureds clause states:

{¶ 52} "6. Separate Insureds—Coverage provided under the Commercial Liability Coverage applies separately to each **insured** against whom claim is made or suit is brought. This does not affect the **limits** stated under How Much We Pay."

{¶ 53} Safeco and the Herberts contend that the foregoing clause means that if an event occurs for which multiple claims are brought, coverage may be excluded for one insured, while another insured's act or omission may be covered. Although we do not necessarily disagree, we fail to see how this fact demonstrates that the policy provides coverage for the Lehrners' claim of negligent hiring, supervision, and retention. The separation-of-insureds clause makes the coverage actually provided by the policy applicable to all insureds equally. It does not purport to create coverage when a policy exclusion applies. In the present case, the Utica policy excludes coverage for the claim of negligent hiring, supervision, and retention against the Herberts, and nothing in the separation-of-insureds clause persuades us otherwise.

{¶ 54} Based on the reasoning set forth above, we sustain Utica's assignment of error and hold that the trial court erred insofar as it determined that the Utica policy covers the Herberts' negligent hiring, supervision, and retention of Howard Jock.

## II.   Direct Appeal by Safeco

{¶ 55} Safeco advances the following nine assignments of error in its direct appeal:

{¶ 56} 1. "The trial court erred in denying American States' motion for summary judgment on the Lehrners' underinsured motorist claims and erred as a

matter of law in concluding the Lehrners could recover underinsured motorist coverage."

{¶ 57} 2. "The trial court erred as a matter of law in concluding that the Lehrners could recover uninsured motorist coverage."

{¶ 58} 3. "The trial court erred as a matter of law in ordering American States to pay prejudgment interest."

{¶ 59} 4. "The trial court abused its discretion in ordering American States to pay prejudgment interest."

{¶ 60} 5. "The trial court erred as a matter of law in calculating prejudgment interest."

{¶ 61} 6. "The trial court erred as a matter of law in entering final judgment against American States as a joint tortfeasor."

{¶ 62} 7. "The trial court erred as a matter of law in concluding American States had a right of contribution."

{¶ 63} 8. "The trial court erred as a matter of law in concluding American States had a right of subrogation."

{¶ 64} 9. "The trial court abused its discretion in failing to enter final judgment."

{¶ 65} In its first assignment of error, Safeco contends that the underinsured-motorist policy it issued to the Lehrners required Howard Jock's liability insurance *and* the Herberts' Utica insurance to be exhausted before coverage would be available. Although the Lehrners settled with Jock for his $25,000 policy limit, Safeco contends that the trial court erred in finding that exhaustion of coverage under the Herberts' Utica policy was not a condition precedent for underinsured-motorist coverage through Safeco. According to Safeco, the Lehrners were not entitled to any underinsured-motorists coverage, because the Herberts had sufficient liability insurance through Utica to satisfy the judgment.

{¶ 66} This assignment of error lacks merit in light of our disposition of Utica's direct appeal. Safeco's argument rests on a premise that the Herberts have coverage available to them under their Utica policy. As we have explained above, they do not. Therefore, there is no additional insurance coverage to be exhausted before the Lehrners may obtain underinsured-motorist coverage through Safeco. Moreover, the only setoff amount available under any liability policy is the $25,000 paid to the Lehrners by Jock's automobile insurer. In its September 23, 2005 final judgment entry, the trial court properly deducted this $25,000 payment from the amount of the jury verdict. As a result, we overrule Safeco's first assignment of error.

{¶ 67} In its second assignment of error, Safeco contends that the trial court erred in finding that the Lehrners were entitled to *uninsured*-motorist coverage on their respondeat superior claim against the Herberts. The trial court addressed this issue in a January 15, 2003 order. It first found that Howard Jock was underinsured because he had only $25,000 of automobile-liability insurance. The trial court then found that the Herberts were uninsured for purposes of the respondeat superior claim against them. As a result, the trial court concluded that Safeco was obligated to provide the Lehrners with underinsured-motorist coverage for their claim against Jock and uninsured-motorist coverage for their respondeat superior claim against the Herberts. On appeal, Safeco contends that the trial court erred in finding the Lehrners entitled to uninsured-motorist coverage for the Herberts' respondeat superior liability.

{¶ 68} Upon review, we find Safeco's argument to be persuasive. Uninsured-motorist coverage protects insureds "who are legally entitled to recover damages *from owners or operators of uninsured motor vehicles.*" (Emphasis added.) Former R.C. 3937.18(A)(1) 1997 Am.Sub.B. No. 261, 147 Ohio Laws, Part II, 2372. Here Jock owned and operated the car involved in the accident, and he had $25,000 in automobile-liability coverage. Therefore, the trial court correctly found that he was an underinsured tortfeasor. As for the Herberts, we agree with the trial court's determination that they were uninsured for purposes of the respondeat superior claim against them.[5] But the Herberts neither owned nor operated the car involved in the accident. Although they were found liable on theories of respondeat superior and negligent hiring, supervision, and retention, they were not motorists at all. As a result, they do not qualify as owners or operators of an uninsured motor vehicle for purposes of the Lehrners' obtaining uninsured-motorist coverage from Safeco. Because Jock had automobile-liability insurance and the Herberts did not own or operate the vehicle involved in the accident, we find no basis for requiring Safeco to provide the Lehrners with *uninsured*-motorist coverage.[6]

{¶ 69} In opposition to the foregoing conclusion, the Lehrners insist that "[t]he Herberts were vicarious operators of the motor vehicle at issue * * *." They base this argument on the fact that the Herberts had control over Jock and were found responsible for his actions through respondeat superior. While acknowledging an absence of case law on point, the Lehrners assert that their position is supported by *Motorists Mut. Ins. Co. v. Tomanski* (1971), 27 Ohio St.2d 222, 56 O.O.2d 133, 271 N.E.2d 924. We disagree. In *Tomanski,* the victim was injured

---

5. The parties do not dispute that this claim was not covered under the Herberts' Utica policy.

6. Safeco remains obligated, of course, to provide the Lehrners with underinsured-motorist coverage by virtue of Howard Jock's lack of sufficient liability insurance.

by the concurrent negligence of an insured motorist and an uninsured motorist. The Ohio Supreme Court held that the victim was entitled to coverage under the uninsured-motorist provision of his policy. Unlike *Tomanski*, the present case does not involve the concurrent negligence of Jock and an uninsured motorist. Jock was the only motorist-tortfeasor, and he was insured. Although the Herberts were tortfeasors, they were not motorists. Therefore, the trial court erred in finding the Lehrners entitled to uninsured-motorist coverage from Safeco on their respondeat superior claim against the Herberts. Safeco's second assignment of error is sustained.

{¶ 70} In its third and fourth assignments of error, Safeco contends that the trial court erred as a matter of law, and abused its discretion, by ordering it to pay prejudgment interest under R.C. 1343.03(A) and 1343.03(C). With regard to the former provision, Safeco contends that no money ever became "due and payable" from Safeco to the Lehrners under R.C. 1343.03(A). This is so, Safeco asserts, because the Lehrners failed to exhaust coverage under the Herberts' Utica policy, which would have been sufficient to satisfy the jury's verdict. With regard to the latter provision, Safeco argues that R.C. 1343.03(C) does not apply to underinsured-motorist claims, which are grounded in contract rather than tort.

{¶ 71} Upon review, we are unpersuaded by Safeco's argument with regard to prejudgment interest under R.C. 1343.03(A). The Ohio Supreme Court has made clear that an underinsured-motorist claim is a contract claim for purposes of R.C. 1343.03(A), the prejudgment-interest statute. *Landis v. Grange Mut. Ins. Co.* (1998), 82 Ohio St.3d 339, 341, 695 N.E.2d 1140. Subsection (A) of the statute provides for an award of prejudgment interest "when money becomes due and payable upon any * * * instrument of writing." Here the "instrument of writing" is Safeco's policy providing the Lehrners with underinsured-motorist coverage. Safeco's argument that no money ever became "due and payable" under the policy is based on the mistaken premise that the Lehrners were required first to exhaust coverage available under the Herberts' Utica policy. As we explained in our analysis of Utica's direct appeal, the Herberts have no coverage available to them in this case. Therefore, there was no insurance to exhaust prior to money becoming due and payable from Safeco to the Lehrners, and the trial court did not err by awarding prejudgment interest under R.C. 1343.03(A).

{¶ 72} We find merit, however, in Safeco's argument regarding prejudgment interest under R.C. 1343.03(C). The legal basis for recovery on an underinsured-motorist claim is contract, and such a claim is subject to an award of prejudgment interest under R.C. 1343.03(A). *Landis*, 82 Ohio St.3d at 340–341, 695 N.E.2d 1140; *Snow v. Pollick*, Lucas App. No. L–02–1104, 2003-Ohio-490, 2003 WL 220457, ¶ 15 (noting that "claims arising out of an uninsured/under-

insured policy of motorist insurance are contractual claims, and as such, R.C. 1343.03(A) is the applicable provision under which to award prejudgment interest"); *Roberts v. State Farm Mut. Auto. Ins. Co.*, 155 Ohio App.3d 535, 545, 2003-Ohio-5398, 802 N.E.2d 157, ¶ 60 (stating that "claims for underinsured motorists coverage are contract claims arising from tortious conduct"); *Oakar v. Farmers Ins. Co. of Columbus, Inc.* (1998), 129 Ohio App.3d 277, 278–279, 717 N.E.2d 778 (recognizing that prejudgment interest on underinsured-motorist claims is governed by R.C. 1343.03(A) rather than R.C. 1343.03(C)). On the other hand, prejudgment interest is available under R.C. 1343.03(C) when a party has engaged in tortious conduct. *Butler v. Minton,* Erie App. No. E–05–061, 2006-Ohio-4800, 2006 WL 2640269, ¶ 31; *Chester v. Custom Countertop & Kitchen, Inc.* (Dec. 17, 1999), Trumbull App. No. 98–T–0193, 1999 WL 1299301 ("A claim for prejudgment interest will be governed by either R.C. 1343.03(A) or (C), depending on whether the claim is contract based or tort based. * * * R.C. 1343.03(A) applies to contract based claims, while subsection (C) only applies to tort based claims"). Here the Lehrners did not obtain a judgment against Safeco on any tort claim, and Safeco is not a tortfeasor. Although there plainly would be no underinsured-motorist claim but for the existence of tortious conduct (i.e., Jock's negligent driving), an underinsured-motorist claim itself remains a contract claim. *Landis,* 82 Ohio St.3d at 340–341, 695 N.E.2d 1140. Therefore, the Lehrners are not entitled to prejudgment interest from Safeco under R.C. 1343.03(C), and the trial court erred in concluding otherwise.[7]

{¶ 73} In opposition to the foregoing conclusion, the Lehrners rely on *Miller v. Gunckle,* 96 Ohio St.3d 359, 2002-Ohio-4932, 775 N.E.2d 475. The issue in that case was whether a prejudgment interest award against an insurance company may exceed the insured's policy limit. In resolving this issue, the majority apparently assumed that R.C. 1343.03(C) applied despite the fact that prejudgment interest had been awarded on an uninsured-motorist claim brought against an insurance company. Id. at 364, 775 N.E.2d 475. The majority's citation to R.C. 1343.03(C) is puzzling, given that the parties, the court of appeals, and even the dissent, consistent with *Landis,* reviewed and discussed the case in the context of R.C. 1343.03(A). In any event, the Ohio Supreme Court's reference to R.C. 1343.03(C) rather than R.C. 1343.03(A) was immaterial to its holding that "an insurer is liable for an entire award up to the insured's policy limit plus any prejudgment interest awarded on that policy limit." Id. at 366, 775 N.E.2d 475.

---

7. We might reach a different conclusion if the Lehrners had asserted and prevailed on a tort claim against Safeco for breach of the duty of good faith toward its insureds. In such a case, an award of prejudgment interest under R.C. 1343.03(C) might be proper. Here, however, the Lehrners did not obtain a judgment against Safeco on any tort claim. Instead, Safeco was found to be contractually obligated to provide the Lehrners with underinsured-motorist benefits.

The *Miller* court's holding did not turn on which subsection of R.C. 1343.03 applied. Therefore, we will treat the citation in *Miller* as dicta and follow *Landis* and the other cases cited above, which directly hold that R.C. 1343.03(A) applies to UM/UIM and other contract-based claims. For the reasons set forth in our discussion of *Landis*, supra, we conclude that the trial court erred in awarding the Lehrners prejudgment interest under R.C. 1343.03(C).[8] Safeco's third and fourth assignments of error are overruled insofar as they relate to R.C. 1343.03(A) and sustained with regard to R.C. 1343.03(C).

■ {¶ 74} In its fifth assignment of error, Safeco claims that the trial court erred as a matter of law in calculating prejudgment interest. In support, Safeco first contends that the trial court erred in holding that prejudgment interest accrued at an annual rate of ten percent from the date of the accident until the entry of final judgment. Safeco argues that the trial court should have determined when money became "due and payable" to the Lehrners under their underinsured-motorist coverage with Safeco and then ascertained the applicable interest rate. In response, the Lehrners argue that the trial court correctly awarded prejudgment interest from the date of the accident and also applied the correct interest rate.

{¶ 75} Upon review, we find Safeco's argument to be persuasive. In a September 6, 2005 order the trial court found the Lehrners entitled to prejudgment interest from Safeco under R.C. 1343.03(A) and 1343.03(C). With regard to the former provision, the trial court specifically held, "Plaintiffs are entitled to prejudgment interest from Safeco, pursuant to R.C. 1343.03(A), at the rate of 10 percent per annum on the $813,000.00 damages award." With regard to the latter provision, R.C. 1343.03(C), the trial court awarded the Lehrners "prejudgment interest, from the date of the accident giving rise to this matter, at the rate of ten percent per annum." Thereafter, in its September 23, 2005 final judgment entry, the trial court ordered Safeco to pay prejudgment interest, pursuant to its prior ruling, on the jury verdicts "at the rate of ten percent per annum from the date of the accident herein, July 23, 1998, until the date this Entry is filed."

---

8. {¶ a} The unavailability of prejudgment interest under R.C. 1343.03(C) is academic, given our finding above that the Lehrners are entitled to prejudgment interest under R.C. 1343.03(A). Even if they qualified for prejudgment interest under subsection (A) and subsection (C), the Lehrners do not suggest that they would be entitled to a double award of prejudgment interest. See *Churchill v. Hamilton Mut. Ins.* (Dec. 4, 1998), Erie App. No. E–98–011, 1998 WL 833553 (recognizing that a trial court cannot award prejudgment interest under R.C. 1343.03(A) and (C), because doing so would double the amount of interest).
{¶ b} Therefore, the applicability or inapplicability of subsection (C) in this case is largely immaterial.

{¶ 76} The trial court's September 6, 2005 ruling did not determine when money became "due and payable" from Safeco to the Lehrners for purposes of a prejudgment-interest award under R.C. 1343.03(A).[9] The trial court simply found that the Lehrners were entitled to such interest "at the rate of 10 percent per annum" without indicating when the interest began to accrue. This omission by the trial court is critical. Under R.C. 1343.03(A), prejudgment interest begins to accrue when money becomes due and payable under an instrument in writing such as an insurance policy. We have recognized that a trial court enjoys broad discretion in determining when money becomes due and payable for purposes of R.C. 1343.03(A). *Mundy v. Roy,* Clark App. No. 2005–CA–28, 2006-Ohio-993, 2006 WL 522380, ¶ 26. In addition to the date of the accident, other possible dates that money may become due and payable under an insurance policy include the date that a court determines that a loss is covered or the date that a jury renders its verdict. Id.

{¶ 77} In the present case, however, the trial court's analysis of prejudgment interest under R.C. 1343.03(A) omits any mention of when Safeco's financial obligation to the Lehrners became due and payable or when prejudgment interest began to accrue.

{¶ 78} As Safeco notes, the trial court also failed to account for a statutory change to the applicable interest rate. The Ninth District recently addressed this issue in *Jones v. Progressive Preferred Ins. Co.,* 169 Ohio App.3d 291, 2006-Ohio-5420, 862 N.E.2d 850, as follows:

{¶ 79} "The language in R.C. 1343.03(A), providing for prejudgment interest rates to be determined according to the annual variable interest rate determined by the Ohio Department of Taxation pursuant to R.C. 5703.47, represents a change from the prior version of that statute, which set the interest rate at ten percent per annum. The change, embodied in Sub.H.B. No. 212, 125 Ohio Laws 63, took effect on June 2, 2004. The uncodified portion of H.B. 212 provides that for court actions pending on the effective date, interest would be awarded at the old statutory rate of ten percent per annum from the date when the money became payable until the effective date and would accrue at the new variable rates beginning on the effective date." Id. at ¶ 20; see also *Mulchin v. ZZZ Anesthesia, Inc.,* Erie App. No. E–05–045, 2006-Ohio-5773, 2006 WL 3114306, ¶ 56–59; *Hausser & Taylor, L.L.P. v. Accelerated Sys. Integration, Inc.,* Cuyahoga App. No. 86547, 2006-Ohio-1582, 2006 WL 832457, ¶ 11–12.

---

9. For purposes of the prejudgment-interest award under R.C. 1343.03(C), the trial court determined that interest began accruing on the date of the accident. For purposes of the award under R.C. 1343.03(A), however, the trial court made no determination as to when interest began to accrue or, more appropriately, when compensation became due and payable from Safeco to the Lehrners.

{¶ 80} Although the present action was pending on June 2, 2004, the trial court's September 2005 ruling awarded the Lehrners prejudgment interest under R.C. 1343.03(A) at the old ten percent rate. Even if the trial court had found money due and payable from Safeco to the Lehrners prior to June 2, 2004, the ten percent interest rate would apply only until that date. After June 2, 2004, a different, variable rate would apply. Based on the foregoing reasoning, we are persuaded by Safeco's argument that the trial court erred in failing to determine when its obligation to the Lehrners became due and payable under R.C. 1343.03(A) and in failing to determine the applicable interest rate in accordance with the amended version of the statute.

{¶ 81} Safeco additionally argues that the trial court erred in merging the prejudgment interest award into the jury's damages award, thereby creating a "new sum total" on which postjudgment interest accrued. In particular, Safeco takes issue with the trial court's holding in its final judgment entry "that prejudgment interest is subject to postjudgment interest and merges with underlying damage award for purposes of postjudgment interest." (Doc. # 106).

{¶ 82} We find Safeco's argument to be without merit. In its final judgment entry, the trial court noted that prejudgment interest amounted to $601,123.78 and that the jury's verdict totaled $838,403.47. The trial court combined these two figures, finding that the Lehrners were entitled, as of the date of its final judgment entry, to a total of $1,439,527.20 minus the $25,000 that Howard Jock's automobile-liability insurer already had paid on his behalf. The trial court then awarded postjudgment interest on this sum. We see no error. "When interest is in fact part of the debt owed, awarding interest upon the interest that is a part of the debt is not compounded interest." *Nakoff v. Fairview Gen. Hosp.* (1997), 118 Ohio App.3d 786, 788, 694 N.E.2d 107. Moreover, "prejudgment interest is a part of the judgment and like all other components is merged into a single judgment." Id.; see also *Singer v. Celina Group* (May 30, 1995), Stark App. No. 94–CA–0333, 1995 WL 495427 (finding that a trial court properly may include prejudgment interest in a final judgment and award postjudgment interest on it); *Schumacker v. Zoll* (Oct. 5, 2001), Lucas App. No. L–00–1199, 2001 WL 1198641 (finding nothing in the prejudgment interest statute "that prohibits the trial court from combining the amount of the jury verdict and the award of prejudgment interest into a single judgment and then ordering interest to accrue on that amount"); *Thirty–Four Corp. v. Hussey* (May 7, 1985), Franklin App. No. 84AP–337, 1985 WL 10275 ("interest upon a judgment is not compound interest, but rather simple interest, on all amounts which the debtor had promised but failed to pay. The expression 'interest due on interest' is merely the recognition that, when periodic payments of interest have not been paid as promised, the unpaid interest can constitute a part of the

judgment which can then bear simple interest in the same manner as the portion of the judgment which represents principal").

{¶ 83} In a final argument under its fifth assignment of error, Safeco contends that the trial court erred in employing a "good faith" analysis when discussing its obligation to pay prejudgment interest. We agree. As set forth above, the applicable prejudgment interest statute was R.C. 1343.03(A) rather than R.C. 1343.03(C). Whether or not Safeco refused to pay underinsured-motorist benefits in good faith "is irrelevant because lack of a good faith effort to settle is not a predicate to an award of prejudgment interest pursuant to R.C. 1343.03(A), as it is under R.C. 1343.03(C)." *Landis*, 82 Ohio St.3d at 341, 695 N.E.2d 1140. Regardless of Safeco's good faith or lack thereof, the proper inquiry under R.C. 1343.03(A) is when underinsured-motorist benefits became due and payable to the Lehrners. Id. Based on the foregoing reasoning, Safeco's fifth assignment of error is sustained in part and overruled in part.

{¶ 84} In its sixth and seventh assignments of error, Safeco contends that the trial court erred as a matter of law by treating it as a joint tortfeasor and finding it jointly and severally liable for the judgment with a right of contribution from Jock and the Herberts. The sixth assignment of error involves the trial court's statement in its final judgment entry that Safeco and the Herberts were jointly and severally liable and that the Lehrners need not seek recovery from "any other tortfeasor or insurer" besides Safeco. (Doc. # 106). The seventh assignment of error stems from the trial court's earlier determination that Safeco "confuses the issue of coverage with a cause for contribution from joint tortfeasors" and that Safeco's remedy in this case "is one for contribution rather than to violate its contract with the Plaintiffs." (Doc. # 414 at 4).

{¶ 85} Insofar as the trial court's rulings suggest that Safeco was a tortfeasor sharing joint and several liability with Jock and the Herberts, we find Safeco's argument to be persuasive. The tortfeasors in the present case were Jock and the Herberts. Neither the trial court nor the jury ever found tort liability on the part of Safeco, which became involved in this litigation only because it provided the Lehrners with underinsured-motorist coverage. Moreover, because Safeco is not a tortfeasor, it cannot have a right of contribution against Jock or the Herberts. The right of contribution is a legal concept that applies to joint tortfeasors. *St. Paul Fire & Marine Ins. Co. v. Cassens Trans. Co.* (C.A.6 Jan. 26, 2004), 86 Fed.Appx. 869 (applying Ohio law). To make a contribution claim, an insurer "must have paid benefits on behalf of a tortfeasor because the contribution statutes allow only a tortfeasor to make a claim for contribution to the extent that the tortfeasor has paid more than its share of liability." Id. Because neither Safeco nor its insureds, the Lehrners, are tortfeasors, Safeco cannot have a right of contribution in this case. Id. The

proper procedure for an insurance company such as Safeco to recover is through subrogation. Id. Accordingly, we conclude that the trial court erred insofar as its rulings suggest that Safeco is a joint tortfeasor with a right of contribution. Safeco's sixth and seventh assignments of error are sustained.

{¶ 86} In its eighth assignment of error, Safeco addresses the subrogation issue, arguing that the trial court erred in finding that it also had a right of subrogation. This argument concerns the trial court's observation in a September 6, 2005 order that when Utica denied coverage on behalf of the Herberts, Safeco should have settled with the Lehrners and then pursued a subrogation claim. Safeco argues that it had (and has) no legal obligation to satisfy the judgment in this case and, therefore, that it can have no right of subrogation. This argument is based on the premise that the Herberts' Utica policy is available to satisfy the judgment. In our analysis above, we have concluded that the Utica policy provides no coverage under the facts of this case. Therefore, Safeco does have a legal obligation to provide the Lehrners with underinsured-motorist coverage. Given our determination that Safeco owes coverage, there is no danger of it being deemed a volunteer as argued in its appellate brief. Finally, as set forth above, Safeco's right to recovery, if any, will be through subrogation. Safeco's eighth assignment of error is overruled.

{¶ 87} In its ninth assignment of error, Safeco contends that the trial court abused its discretion in failing to enter final judgment. In particular, Safeco argues that the trial court abused its discretion by not entering final judgment until approximately two and one-half years after the first damages trial and one and one-half years after the second damages trial. According to Safeco, the delay prejudiced it by increasing the amount of its prejudgment-interest obligation.

{¶ 88} Upon review, we find Safeco's argument to be unpersuasive. Following the first damages trial in January 2003, the Lehrners filed motions for a new trial and prejudgment interest. Safeco and Utica also filed premature appeals, which we dismissed. After briefing was completed, the trial court on September 10, 2003, granted the Lehrners a new trial on the limited issue of Ann Lehrner's loss of support from Leon Lehrner's reasonably expected earning capacity. The second damages trial took place in March 2004. After the second jury failed to award any loss-of-support damages, the Lehrners moved for another new trial and again requested prejudgment interest. Following briefing, the trial court in June 2004 set an August 2004 hearing date for the prejudgment interest issue. The hearing subsequently occurred over parts of five days and concluded on October 1, 2004. The parties filed posthearing briefs in December 2004. In light of the foregoing facts and procedural history, we find no unreasonable or unexplained delay attributable to the trial court through December 2004.

{¶ 89} The trial court, however, did not resolve the prejudgment-interest issue and other pending motions until September 6, 2005. Thus, more than eight months elapsed from the completion of briefing until the trial court disposed of the prejudgment-interest issue and other pending matters. Shortly thereafter, on September 23, 2005, the trial court filed its final judgment entry. In our view, the only delay that was even arguably unreasonable was the trial court's eight-month delay before resolving the postjudgment-interest issue and certain other pending motions. The last journal entry in the trial court's docket prior to its September 6, 2005 ruling is date-stamped January 6, 2005.

{¶ 90} Even assuming, arguendo, that the eight-month delay discussed above was unreasonably long, Safeco has not pointed to any evidence indicating that it objected during the eight-month period. In its appellate brief, Safeco insists that it made "repeated requests to the trial court to enter final judgment." It cites nothing, however, to support this assertion. A party's silence in the face of a trial court's delay in entering judgment waives the issue for appeal. *Williams v. ITT Financial Serv.* (June 25, 1997), Hamilton App. No. C–960234, 1997 WL 346137. The proper way to raise the issue is by motion followed by a petition for a writ of mandamus or procedendo, if necessary. Id. Here the record is devoid of any motion or petition filed by Safeco in the months preceding the trial court's September 2005 ruling on the prejudgment interest issue and entry of final judgment. As a result, Safeco cannot now complain that it was prejudiced by the delay. Safeco's ninth assignment of error is overruled.

### III. Cross–Appeal by the Herberts

{¶ 91} The Herberts advance the following assignment of error on cross-appeal:

{¶ 92} "The Trial Court erred when it held in its entry of September 23, 2005, that Utica, although having a duty to defend and indemnify, did not have the primary, and only, duty to satisfy the judgment rendered against Michael Herbert and Sharon Herbert *dba* La Vello's Pizza."

{¶ 93} The Herberts argue that the Utica policy provided enough coverage to satisfy the judgment obtained by the Lehrners. Therefore, they contend that the trial court erred in finding Safeco, as opposed to Utica, primarily responsible for paying the judgment. According to the Herberts, no basis for an underinsured-motorist claim under the Safeco policy exists if coverage is available under the Utica policy to satisfy the Lehrners' judgment.

{¶ 94} Upon review, we find the foregoing argument to be unpersuasive. For the reasons set forth in our analysis of Utica's direct appeal, we conclude that no coverage is available under the Utica policy. Because the Utica policy provides

no coverage in this case, the trial court did not err in holding that Safeco had the primary obligation to satisfy the judgment. Indeed, as between Safeco and Utica, Safeco has the only obligation. The Herberts' assignment of error on cross appeal is overruled.

## IV. Cross–Appeal by Safeco

{¶ 95} Safeco advances one assignment of error in its cross-appeal:

{¶ 96} "The trial court erred as a matter of law in its final judgment entry by holding that Utica First Insurance Company was not required to pay its liability coverage although the trial court held on two prior occasions that the liability coverage was available for payment."

{¶ 97} In this assignment of error, Safeco argues that the trial court erred in not finding Utica obligated to pay the verdict rendered against the Herberts. Although Safeco advances several arguments in support of its cross-appeal, we previously considered and rejected each of them above, in our analysis of Utica's direct appeal. Therefore, for the reasons set forth in that portion of this opinion, we hold that Utica was not required to provide coverage for the judgment against the Herberts. Safeco's assignment of error on cross-appeal is overruled.

## V. Cross–Appeal by the Lehrners

{¶ 98} The Lehrners advance two assignments of error in their cross-appeal. The first is as follows:

{¶ 99} 1. "The Trial Court erred in denying Plaintiffs' Civil Rule 50 and 59 motion for judgment notwithstanding the verdict on the sole issue of the economic loss damage to the estate of Leon Lehrner."

{¶ 100} Although the Lehrners' first assignment of error refers to the trial court's denial of judgment notwithstanding the verdict, the argument that follows addresses only the trial court's denial of a new trial after a second jury returned a verdict of zero damages for Ann Lehrner's loss of support from the reasonably expected earning capacity of Leon Lehrner. The argument under the first assignment of error contains absolutely no analysis or discussion of the JNOV issue, and the Lehrners conclude their brief by requesting "a new trial on the sole issue of the economic loss/loss of earning capacity damages resulting from Leon Lehrner's death." As a result, we will limit our own analysis to the new-trial issue.

{¶ 101} In denying another new trial on the issue of Ann Lehrner's loss of support from Leon Lehrner's reasonably expected earning capacity, the trial court noted that the motion sought relief under Civ.R. 59(A)(4), which applies where excessive or inadequate damages appear to have been given under the

influence of passion or prejudice, and under Civ.R. 59(A)(7), which provides for a new trial where "[t]he judgment is contrary to law." The trial court noted that the motion alternatively sought relief under Civ.R. 59(A)'s catchall provision "for good cause shown."

{¶ 102} In overruling the Lehrners' motion, the trial court reasoned as follows:

{¶ 103} "There is no evidence before the Court to indicate that the verdict in the second damages trial herein, which was consistent with the first, was rendered under the influence of passion or prejudice. This Court cannot say that the verdict is contrary to law, or that a determination of zero dollars for economic loss cannot be reconciled with the evidence. Finally, Plaintiffs have not shown good cause for a third trial on this issue." (Doc. # 93 at 6).

{¶ 104} On appeal, the Lehrners assert that the trial court's ruling is erroneous for several reasons. First, they contend that the law-of-the-case doctrine compelled the trial court to grant a second new trial on the issue of Ann Lehrner's loss of support from Leon Lehrner's reasonably expected earning capacity. In support, the Lehrners note that the trial court previously had granted a new trial on September 10, 2003, after the first jury failed to award any loss-of-support damages. The Lehrners contend that no appeal was taken from this September 10, 2003 decision granting a new trial. Because the evidence and issues essentially were the same at the second damages trial, the Lehrners assert that the trial court was required to apply the law-of-the-case doctrine and to grant another new trial after the second jury also refused to award any loss-of-support damages.

{¶ 105} Upon review, we find no merit in the Lehrners' law-of-the-case argument. The doctrine generally "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 462 N.E.2d 410. Nevertheless, we have recognized an extension of the doctrine to " 'encompass a lower court's adherence to its own prior rulings or to the rulings of another judge or court in the same case.' " *Barlowe v. AAAA Internatl. Driving School, Inc.*, Montgomery App. No. 19794, 2003-Ohio-5748, 2003 WL 22429543, ¶ 12, quoting *Poluse v. Youngstown* (1999), 135 Ohio App.3d 720, 725, 735 N.E.2d 505. It is well settled, however, that the doctrine "is considered to be a rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results." *Nolan*, 11 Ohio St.3d at 3, 11 OBR 1, 462 N.E.2d 410.

{¶ 106} Application of the doctrine here would achieve an unjust result and is not appropriate. We reach this conclusion for at least three reasons. First, the Lehrners never raised their law-of-the-case argument in the trial court. If the Lehrners believed the doctrine compelled the trial court to grant them a second

new trial on the issue of loss-of-support damages, they should have informed the trial court so. In their second motion for a new trial, however, the Lehrners did not mention the law-of-the-case doctrine at all. They simply asked the trial court to grant them another new trial in the exercise of its discretion. Therefore, we cannot say that the trial court erred in failing to apply the doctrine.

{¶ 107} Second, the Lehrners argue that the trial court's September 10, 2003 decision granting a new trial should stand as the law of the case because the defendants never challenged it on appeal. But the Lehrners ignore the fact that a timely appeal *was taken* from the trial court's decision granting the first new trial on the loss-of-support damages issue. Safeco filed an October 9, 2003 notice of appeal from that decision. The Lehrners opposed the appeal, arguing that the trial court's September 10, 2003 decision granting a new trial on the loss-of-support damages issue was not appealable. Ultimately, we rendered a March 4, 2004 final judgment in which we agreed and dismissed the appeal, finding that the trial court's September 10, 2003 order granting a new trial was not immediately appealable. In response, Safeco and the Herberts moved the trial court for Civ.R. 54(B) certification, so its first new-trial ruling could be appealed. The Lehrners opposed Civ.R. 54(B) certification. The trial court later declined to grant certification, without explanation.

{¶ 108} In light of the foregoing facts, it would be inequitable to conclude that the trial court's September 10, 2003 decision granting the first new trial became the law of the case and compelled the trial court to grant a second new trial. Safeco made every effort to appeal the trial court's original decision granting a new trial on the issue of loss-of-support damages. Thus, we are unpersuaded by the Lehrners' argument that Safeco and the other defendants should be bound by the trial court's initial new-trial ruling because it was not appealed.

{¶ 109} Third, even assuming, arguendo, that the law-of-the-case doctrine did obligate the trial court to grant a second new trial when presented with essentially the same evidence that it found sufficient to justify the first new trial, we would not be bound to follow the trial court's ruling. Even though the law-of-the-case doctrine may bind a lower court to follow its own prior, unappealed decision, the doctrine does not compel a higher appellate court to do likewise. *New York Life Ins. Co. v. Hosbrook* (1935), 130 Ohio St. 101, 3 O.O. 138, 196 N.E. 888 at syllabus ("Where, on a first hearing, a Court of Appeals has committed prejudicial error in determining the 'law of the case' for the guidance of the trial court after remand, and, upon a later hearing adheres to such determination, this court, as the last state court of review, will disturb such former determination of the Court of Appeals and will reverse its judgment, where it results from such erroneous determination"); *F. Enterprises, Inc. v. Kentucky Fried Chicken Corp.* (1976), 47 Ohio St.2d 154, 162, 1 O.O.3d 90, 351 N.E.2d 121 ("a prior erroneous

unappealed decision of a Court of Appeals which established the law of the case for a subsequent trial, which erroneous decision is adhered to by the Court of Appeals in a second appeal, does not bind this court upon a further appeal"); *Stemen v. Shibley* (1982), 11 Ohio App.3d 263, 266, 11 OBR 441, 465 N.E.2d 460 (recognizing that "the Ohio Supreme Court is not bound by the doctrine of the law of the case to follow an erroneous decision by the court of appeals"). Although the foregoing cases stand for the proposition that the law-of-the-case doctrine does not compel the Ohio Supreme Court to follow a prior, unappealed decision by a court of appeals, we discern no reason why the same rationale would not preclude a court of appeals from being bound by a trial court's prior, unappealed decision. Therefore, even if the trial court had invoked the law of the case and had granted a second new trial based on the doctrine, we would remain free in this appeal to determine whether the decision to grant a new trial was correct.

{¶ 110} The Lehrners next argue that the trial court should have ordered another new trial because the second jury verdict awarding zero dollars for loss-of-support damages was contrary to law. In support, the Lehrners contend that the second damages jury disregarded the trial court's instruction to determine "what sum of money" would fairly compensate Ann Lehrner for her loss of support from the reasonably expected earning capacity of Leon Lehrner. The Lehrners argue that this was an instruction to award a sum of money and that a zero-dollar award is contrary to the instruction. We disagree. The trial court asked the jury to determine "what sum of money" would compensate Ann Lehrner, and the jury concluded that an award of zero dollars was appropriate. On its face, this verdict does not run afoul of the trial court's instruction.

{¶ 111} The Lehrners additionally assert that the trial court erred by misapplying the "passion or prejudice" and "contrary to law" standards for granting a new trial under Civ.R. 59(A). In support, the Lehrners cite testimony from the second damages trial that Leon Lehrner was "the boss" of the pawn shop, that he was in good health, and that he had no plans to retire. They then argue that the jury's award of zero damages cannot be reconciled with the evidence. As a result, they contend that the verdict is contrary to law. Based on their belief that the verdict is disproportionate to the uncontroverted evidence, the Lehrners also assert that "it should shock the sense of fairness and justice of any reviewing court, and [it] was therefore influenced by passion or prejudice." According to the Lehrners, "[d]espite the undisputed evidence that Leon Lehrner was employed at the time of his death and even worked on the day of his death, [the jury] still awarded no damages for the loss of his reasonably expected earning capacity." The Lehrners argue that such a result cannot be reconciled with R.C.

2125.02, which creates a rebuttable presumption of damages in a wrongful-death case.

**{¶ 112}** We find the foregoing arguments to be unpersuasive. Ohio's wrongful-death statute provides that the surviving spouse, children, and parents of a decedent all are "presumed to have suffered damages by reason of the wrongful death." R.C. 2125.02(A)(1). Consistent with the statute, the Lehrners received substantial wrongful-death damages in this case. The second damages jury simply declined to make an award for *one type* of damages available under the statute, namely Ann Lehrner's loss of support from the reasonably expected earning capacity of Leon Lehrner. The Lehrners cite no authority for the proposition that wrongful-death plaintiffs are presumed to have suffered each type of damages listed in the statute. But even if such a presumption were to exist, the trial court never instructed the jury on it. Absent such an instruction, which the Lehrners have not raised as an issue on appeal, we find no merit in their argument that Ann Lehrner was rebuttably presumed to have suffered loss-of-support damages.

**{¶ 113}** We are equally unpersuaded by the Lehrners' contention that undisputed evidence of Leon Lehrner's ongoing operation of the pawn shop, good health, and lack of intent to retire necessitated an award of some loss-of-support damages. This uncontroverted evidence certainly supports, and may even compel, a finding that Leon Lehrner himself had a "reasonably expected earning capacity" at the time of his death. Under the statute, however, Ann Lehrner was entitled to damages only for her "loss of support" from that reasonably expected earning capacity. R.C. 2125.02(B)(1). Thus, it was not enough to show that Leon Lehrner had the capacity to earn money. In order to prevail, the plaintiffs also had to demonstrate Ann Lehrner's loss of support from that earning capacity.[10]

{¶ 114} Although it ordinarily might follow that a surviving spouse experiences a loss of support when her husband dies while employed, the jury could have reached a contrary conclusion in this case. Based on the evidence presented, the

---

**10.** For this reason, we reject the Lehrners' argument that "[i]f this shocking verdict is permitted to stand, the standard for this community would be that the death of a vibrant, self-employed businessman due to the criminal acts of a third party is worth nothing (zero) economically." This argument confuses the value of Leon Lehrner's life with Ann Lehrner's loss of support from his earning capacity. For present purposes, the issue is not whether Leon Lehrner's life had any value. Clearly it did, and the Lehrners obtained a sizeable wrongful-death damages verdict in the first damages trial. The issue before us, however, is whether the Lehrners demonstrated any loss of support to Ann Lehrner as a result of her husband's death. For the reasons set forth above, we believe the jury reasonably could have found a lack of evidence on the loss-of-support issue.

jury reasonably might have found insufficient evidence that Ann Lehrner suffered any loss of support from her husband's earning capacity. Certified public accountant Ralph Schwartz testified that Don's Pawn Shop was a family business operated as a C-corporation and owned exclusively by Leon, Ann, and Harvey Lehrner. (March 22, 2004 transcript, vol. I, 78, 83). Harvey Lehrner testified that he owned stock in the company along with Ann Lehrner and Leon Lehrner, who was the principal owner prior to his death. (March 23, 2004 transcript, vol. II, 160–161). When Leon Lehrner died, the pawn shop had approximately eight full-time employees and three part-time employees. (Id. at 171). Schwartz testified that Leon, Ann, and Harvey Lehrner set their own salaries. (Id. at 82–83, 89). Likewise, economist John Burke testified that the Lehrners could "kind of decide how much one person is going to get, [and] how much another person is going to get." (March 23, 2004, transcript, vol. II, p. 228).

{¶ 115} In light of the foregoing testimony, the jury reasonably may have inferred that Leon Lehrner's reasonably expected earning capacity was directly linked to his ownership interest in Don's Pawn Shop. This is so because his ownership interest allowed him to establish his own income from the business profits.[11] Without any evidence from the Lehrners as to the disposition of Leon Lehrner's ownership interest upon his death, the jury reasonably may have found a lack of proof that Ann Lehrner suffered any loss of support. Indeed, after Leon Lehrner's death, there were only two owners of the closely held corporation. Therefore, the jury reasonably may have found, absent any evidence to the contrary, that upon her husband's death Ann Lehrner could control her own salary, along with her son Harvey, and pay herself the money that Leon Lehrner formerly had brought home. Counsel for Safeco touched on this theme during closing argument, telling the jury without any objection from the Lehrners:

{¶ 116} "It's also very important that you know and heard that it was Harvey Lehrner and Ann Lehrner who told you that this is a family-run operation. It's owned by the family. It's always been owned by the family and [is] still owned by the family. So the question is, is there any loss in this case? That is the question you're going to decide.

{¶ 117} "Second element is loss of support.  * * *

---

11. Indeed, the jury heard testimony that Leon Lehrner paid himself wages of $215,999.96 in 1994, $181,199.98 in 1995, $168,900 in 1996, and $158,500 in 1997. (March 22, 2004, transcript, vol. I, p. 80–85). We find it extremely improbable that Leon Lehrner would have commanded such high salaries if he had been a hired employee of the pawn shop rather than its majority owner. Therefore, it is reasonable to conclude that his future earning capacity was linked to his ownership interest in the company.

{¶ 118} "Where was the loss of support? What's the evidence? Did they bring any evidence whatsoever? I suggest to you that there is no evidence of loss of support in this particular case." (March 24, 2004, transcript, vol. III, 327–328).

{¶ 119} Similarly, counsel for the Herberts told the jury without objection from the Lehrners:

{¶ 120} "Certainly there's a loss to Ann Lehrner. Certainly there's a terrible void to Ann Lehrner and to Harvey Lehrner and to all the other family. But it's not support. And there was no evidence of support. And if there is no evidence of loss of support, then this narrow issue, this component, cannot be the basis for you to render a verdict for Ann Lehrner for that component." (Id. at 338).

{¶ 121} In response, the Lehrners' counsel disputed the absence of loss-of-support evidence, telling the jury:

{¶ 122} "Is there a loss in this case? Is there a loss? There is no evidence of loss of support?

{¶ 123} "This woman's husband was killed and taken from her. He earned that amount of money in the years before—the immediate years before his death. No loss of support? What do we have to prove? What do we have to show you?" (Id. at 341–342).

{¶ 124} The answer to counsel's rhetorical questions is twofold. Counsel had to show (1) Leon Lehrner's reasonably expected future earnings ("earning capacity") and (2) Ann Lehrner's loss of those future earnings as a result of his death ("loss of support"). The Lehrners satisfied the first requirement by presenting evidence of Leon Lehrner's income from the business through the time of his death and of his intent to continue working. There was no evidence, however, that Ann Lehrner, a co-owner of the business, actually lost any income (support) as a result of her husband's death. The Lehrners might have made such a showing by presenting evidence, for example, that Ann Lehrner's income from the business after her husband's death did not equal Ann and Leon Lehrner's combined income from the business prior to his death. There also may have been other ways that a loss of support could have been shown. The plaintiffs, however, actively opposed the presentation of any such evidence to the jury. One possible reason for their opposition may have been that Ann Lehrner, in fact, did not suffer a loss of support due to her husband's death.

{¶ 125} According to the Herberts, Ann Lehrner owned 30–percent of the company prior to her husband's death. At the time of his death, she inherited his 54 percent ownership stake, which gave her a controlling interest in the company, the ability to set her own salary, and a right to the majority of the corporate profits. (Doc. # 13, February 28, 2003 memorandum). The jury in the second

damages trial heard none of this information, however, because the Lehrners apparently persuaded the trial court—incorrectly we believe—that it was irrelevant.[12]   In any event, based on the evidence that was presented, the jury reasonably may have found no proven loss of support from Leon Lehrner's reasonably expected earnings.   Therefore, we cannot say that the jury's award of zero dollars for loss-of-support damages was contrary to law, disproportionate to the uncontroverted evidence, or so shocking to our sense of fairness and justice that it must have been influenced by passion or prejudice.   Accordingly, we find no error in the trial court's rejection of the Lehrners' motion for another new trial on the loss-of-support issue.   The Lehrners' first assignment of error is overruled.

{¶ 126} In their second assignment of error, the Lehrners assert:

{¶ 127} "The Trial Court erred in denying Plaintiffs' motion for prejudgment interest against Utica First Insurance Company, the insurers of Michael and Sharon Herbert."

{¶ 128} The Lehrners claim the trial court erred in overruling their motion for prejudgment interest against Utica under R.C. 1343.03(C), which applies to civil actions based on tortious conduct and provides for an award of prejudgment interest when "the party required to pay the money failed to make a good-faith effort to settle the case."   In response, Utica articulates several reasons why it believes that the trial court properly declined to order it to pay prejudgment interest.   Among other things, Utica argues that a personal-injury plaintiff cannot seek prejudgment interest directly against a liability insurer of a tortfeasor-defendant.

{¶ 129} In light of our resolution of Utica's direct appeal, however, we see an even plainer reason why it cannot be required to pay prejudgment interest:  the Utica insurance policy issued to the Herberts provides no coverage here, and Utica has no obligation to satisfy the judgment in this case.   Given that Utica has no financial obligation to the Herberts, its insureds, it likewise has no obligation to pay the Lehrners any prejudgment interest.   Accordingly, we overrule the Lehrners' second assignment of error.

---

12.   In its decision granting the first new trial on the issue of damages, the trial court pointed out that under R.C. 2125.02, a jury "may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death."   One of those factors was Ann Lehrner's right to Leon Lehrner's ownership interest from which he derived his reasonably expected earning capacity.   Another factor was her right to set her own salary upon her husband's death and thereby directly obtain his reasonably expected future earnings.

## VI. Conclusion

{¶ 130} Based on the reasoning set forth above, the judgment of the Montgomery County Common Pleas Court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

FAIN and WALTERS, JJ., concur.

SUMNER E. WALTERS, J., retired, of the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.