[Cite as *Emswiler v. Bodey*, 2012-Ohio-5533.]

IN THE COURT OF APPEALS FOR CHAMPAIGN COUNTY, OHIO

MARLA EMSWILER                         :

    Plaintiff-Appellant              :                    C.A. CASE NO.    2012 CA 3

v.                                     :                    T.C. NO.    07CV246

BART BODEY, et al.                     :                    (Civil appeal from
                                               Common Pleas Court)

    Defendants-Appellees             :

                                       :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   30th   day of   November  , 2012.

. . . . . . . . . .

S. TODD BRECOUNT, Atty. Reg. No. 0065276, 108½ Miami Street, Urbana, Ohio 43078
    Attorney for Plaintiff-Appellant

CATHY J. WEITHMAN, Atty. Reg. No. 0020889, 201 West Court Street, Urbana, Ohio 43078
    Attorney for Defendant-Appellee Tony Barr

. . . . . . . . . .

DONOVAN, J.

{¶ 1}     This matter is before the Court on the Notice of Appeal of Marla Emswiler,

filed January 27, 2012.  Emswiler appeals from the December 30, 2011 decision of the trial

court which granted judgment in favor of Bart Bodey and Tony Barr, following a lengthy trial to the bench, on multiple claims by Emswiler, arising from the November, 2005 construction of a pole barn on her property. Prior to trial, the court also granted default judgment in favor of Emswiler and against Fred Seward on multiple claims arising from the remodeling of Emswiler's home, and following trial, the court awarded treble damages in the amount of $762,486.33.00 against Seward, who did not appear at trial. The record reflects that Bodey initially worked for Seward on Emswiler's home, until Emswiler terminated Seward. Bodey and Barr then constructed the pole barn for Emswiler, and her appeal is limited to issues arising from the construction of the pole barn. We note that Bodey did not file a brief herein, and Barr's brief provides that Bodey is deceased. We hereby affirm the judgment of the trial court.

{¶ 2} Emswiler's amended complaint, filed July 23, 2007, against Seward, Barr and Bodey, alleged in relevant part that Emswiler paid Barr and Bodey over $10,000.00 to construct the pole barn, excluding materials, and that Barr and Bodey failed to complete the project in a workmanlike manner. She further alleged that she spent $20,000.00 on materials for the barn. Emswiler alleged, in relevant part, breach of contract, fraud, negligent misrepresentation, negligence, unjust enrichment, violations of the Consumer Sales Practices Act, and negligent hiring and supervision. On April 20, 2010, Bodey failed to appear at a status conference, and counsel for Emswiler and counsel for Barr agreed to try the matter to the bench. Trial was held on January 25-26, 31, February 25, March 9, and March 21, 2011. Bodey ultimately appeared pro se and Barr was represented by counsel.

{¶ 3} Billy Lohnes testified that he has been doing roofing work since 1984.

He stated that Emswiler "is a friend of mine," and that she asked him to inspect the roof on her pole barn in the summer of 2006. Lohnes testified that he observed that 100 nails on the back of the barn roof and 50-100 nails on the front part of the barn roof were improperly installed. Lohnes stated that "you could repair the roof, but the time that it would take to repair those and take them all out, you [could] probably tear it off faster and put another roof on." Lohnes stated that he was in the barn when it was raining, and that he observed a leak "in the middle of the barn." When asked if he would classify the barn roof as "unworkmanlike work," Lohnes responded affirmatively, and he stated, "I don't think I would have my job, any job very long if I continued on that path of recklessness."

{¶ 4}    Jean Gaver, the chief building official for Champaign County, testified that he inspected the pole barn twice. Gaver stated that Jeff Siefert performed the original inspections on the barn in the course of its construction, and that Gaver reviewed the file with Siefert in the ordinary course of his business. According to Gaver, Siefert was unavailable to testify, having moved to Alabama. Gaver described the three inspections done on the pole barn as "footer, framing, and then final," and he stated that the barn passed all three inspections. He further testified that there "wasn't an inspection completed * * * as far as the slab and the final grade." Gaver stated that he inspected the barn after it was completed, and that he did not believe the poles were set deep enough to prevent "uplift" from "wind underneath the structure." He also stated that the poles must be set on "solid ground" or cement, and Gaver testified that there "seemed to be a little concrete at the bottom [of the holes], but I couldn't really tell how much was below there." Gaver stated that the lack of a concrete slab floor "can allow moisture to come up through the floor a little

more." At trial the following exchange occurred:

Q. * * * Do you believe Mr. Siefert was in error in passing the barn for inspection?

A. Well, I'm - - per my conversation with him, to his understanding there was going to be a slab and backfill brought in.

Q. Slab and backfill you believe could have caused - - or could have remedied the problem?

A. It could have put it where it would have been the post would have been in the right depth. That would have solved some of the problem there, yes.

Q. * * * So, in other words, you're building up another foot on the post by putting in backfill; that is what you are saying?

A. Correct.

{¶ 5} On cross-examination, Gaver testified that a proper permit was obtained for the pole barn. Gaver stated that he did not observe "any uplift" when he inspected the barn. Thereafter the following exchange occurred:

Q. * * * Would it surprise you if there's testimony that your inspector indicated to the homeowner that there ought to be a floor put in the barn?

A. No. I think sometimes they do give suggestions.

Q. * * * Did you see any other structural issues when you went out to investigate or to walk through this barn?

A. Not that I can recall off the top of my head, no.

Q. And do you recall how far down the holes were dug that you looked at?

A. About 36 inches, I think it was.

Q. And if you put - - you say you have to put something down in the bottom of the holes to - - is to, what, steady the - -

A. It's going to be on solid (sic). It can't be on a bunch of fill so it drops.

Q. * * * Concrete blocks, would those be it?

A. That can work. Or compact in the soil.

* * *

Q. And do you know if there are any concrete blocks down at the bottom of these holes?

A. That I don't know, no. I didn't see any, no.

Q. * * * And you didn't actually dig any of the holes or - -

A. No.

Q. - - do any inspection on this, Mr. Gaver; is that correct?

A. No, I didn't.

{¶ 6}    The following exchange occurred between Gaver and the trial court:

THE COURT: Why were you out at the property for either one of your walk-throughs?

THE WITNESS: A call from Mr. Brecount [counsel for Emswiler].

* * *

THE COURT: It is a correct statement that the code then - - and then means when the barn was built - - and the code now do not require concrete at the base of the pole hole?

THE WITNESS: The code changes every three years. Now the requirement is a cookie on the bottom of the post hole.

THE COURT: A cookie?

THE WITNESS: Concrete slab, basically round, eight inches round, usually two inches thick.

THE COURT: Concrete is required now?

THE WITNESS: Right, yes, sir.

THE COURT: Was concrete required at the time of this construction?

THE WITNESS: Not at that time.

{¶ 7} Gaver stated that the final inspection of the barn occurred on December 30, 2005. Gaver stated that the building plan for the barn "calls for two-inch concrete pad, two inches of gravel" at the bottom of the poles. Gaver stated that Emswiler's signature appears on the permit application for the barn, and that "Barr Construction" is listed as the contractor. He stated that the permit was issued to Bodey, and that Barr Construction is identified on an addendum thereto.

{¶ 8} Leslie Nelsh testified that she is a "picker," and that she sells the items she "picks" at various flea markets. She stated that she and Emswiler are friends, and that she estimated the value of the items Emswiler stored in the pole barn, in the absence of damage from water, animal feces and urine, and mold, at $847,500.00. She estimated their value in their current condition at "zero dollars." She testified that on one occasion when she was

going through Emswiler's items in the barn, it began to rain and the barn's roof leaked in "more than 20" places, and that "48, 50 percent of the ground" inside the barn was wet. On cross-examination, she testified that the containers in the barn appeared to have been ransacked by a human being, and also that animals had gotten into the barn and damaged the items. She stated that she observed that animals had gotten into the barn in "late 2007." Nelsh stated that she did not know when the barn was built, when the items were stored in the barn, or where they had previously been stored. Nelsh stated that there were multiple tarps in the barn, but that they had been taken off of the items.

{¶ 9} Susan Panter testified that Emswiler lives with her in Urbana, and that they have been friends for 30 years. Panter stated that Emswiler has "collected things all her life," and that Emswiler "has PTSD from the military and she needs something to keep her busy because she can't hold a job. * * *." Panter stated that she observed leaks in the roof of the barn, and that it "was dripping water through the rafters down on the boxes." Panter stated that Emswiler previously stored items in 10 rental storage units, and that Emswiler moved the items into her house and pole barn "to save money to finish up the house." Panter stated that Emswiler "could easily be considered a hoarder."

{¶ 10} Jack Ball testified that he has been a subcontractor for 25 years, and he stated that he evaluated the workmanlike quality of the barn at Emswiler's request. Ball testified that he dug beneath multiple posts in the barn and that there was no concrete beneath them to properly "stabilize" them. He further stated that the barn was made with "inferior lumber" that had "gouges out of it, splits," that would "weaken the whole structure." He stated that two thirds of the poles were not pressure treated. When asked

about the significance of using pressure treated lumber, Ball replied, "It also helps keep out the rot, moisture. That's what you're sinking in the ground. You have all of that moisture coming up out of the ground itself." Ball stated that the poles were set at the correct depth.

{¶ 11} Ball identified an itemized list of "problems I found with the barn, things that weren't correct, things that were missing" as follows: 1) metal siding improperly cut "allowing snow, rain and moisture to get in"; 2) "bolts on rib metal improperly installed"; 3) "ribbed metal not overlapped correctly allowing all of the metal walls to pull apart," 4) "overhead trim improperly installed," 5) "no places were caulked," 6) "fascia and metal trim severely buckled," 7) "garage door trim improperly cut, needs replaced," 8) "no roof vents were installed," 9) "entry doors improperly installed," 10) "screws improperly installed in door jams causing wood to split," 11) "soffit panels loose and improperly fit to not allow wildlife to get in," 12) "no vents, no perforated soft vent," 13) "base gravel needs filled higher," 14) "shingles buckling, the roof leaks, nails were shot into it," 15) "no headers above the entry doors," 16) "headers not braced properly," 17) "channels improperly cut, J channels," 18) "most all the trim work needs replaced due to being improperly cut," 19) entry doors "needed paint * * * to keep from rusting," 20) "braces laterally for outside ribbed metal, two by fours. Should be at least two by sixes," 21) "roof is sagging."

{¶ 12} Ball played a DVD for the court that he made, and that he asserted demonstrated the problems with the barn. Ball stated that there are gaps of between three to nine inches between the overhead doors and the ground. Ball concluded that the barn is not salvageable, and he indicated that he prepared an estimate for Emswiler, in the amount of $9,000.00, to remove the structure, "grade the property where the new barn was going up,

getting rid of all the debris, and erecting another pole barn." Ball stated that materials for the new barn would cost $18,500.00.

{¶ 13} On cross-examination, Ball testified that he "never claimed to be" a licensed contractor. Ball stated that his girlfriend and Emswiler "are real good friends. Have been for years." Before the barn was built, Ball testified that he observed the materials for the barn laying on the ground at Emswiler's property.

{¶ 14} The following exchange occurred on recross-examination:

BY MR. BODEY:

Q. In the video where you dug down in front of the pole and held the tape measure and said the bottom of the pole was 12 inches deep?

A. That's as far as I could go. There was supposed to have been somebody there helping me, but there wasn't. With the light and the tape and that's as far as I could do.

Q. That's as far as you could reach? That wasn't the actual bottom of the post?

A. I would have went down further than that, but I was holding on to three things at once. I had the tape measure, light, and the camera.

Q. I see. I see.

A. I had to get everything together there. I started fumbling around a little.

Q. I see.

A. But I did go down below.

\* \* \*

THE COURT: Thank you.

You went down below what?

A.   THE WITNESS:    To the bottom of the posts.   But it wasn't on the video because I couldn't get it all together there because of the depth.

REDIRECT EXAMINATION

BY MR. BRECOUNT:

Q.   Mr. Ball, how many posts did you go down to the bottom of one (sic)?

A.   That's what I say before, I don't remember how many.   I think it was like six, but I wouldn't swear to it.   I know at least six.

Q.   And when you say you went to the bottom of the post, you went down to where the post - -

A.   Post ended and dirt started.

\* \* \*

RECROSS-EXAMINATION

BY. MRS. WEITHMAN:

Q.   So it's your testimony that the poles were resting on dirt?

A.   Resting on the ground.

Q.   On dirt?

A.   Yes.

Q.   Had it appeared that the building was starting to - - you said

wouldn't be structurally sound if it was sitting on dirt.  Did you notice that the building was becoming structurally unsound?

A.  Not yet

* * *

THE COURT: * * * Did you measure how far down it was from the surface to the bottom of the pole?

THE WITNESS: I don't think I did.  I just remember reaching down in there with the flashlight and putting my hand down there and feeling down below, below the posts to see if there was anything there, like a plate or concrete.

{¶ 15}  On redirect examination, Ball stated that the metal siding for the barn was "supposed to be already pre-cut so they just fit right in and join together."  He stated, "I don't know what the deal was and why they recut it.  I guess they didn't have the poles set right or something and they were trying to get it to match up, which didn't happen."  Due to the improper cutting and installation of the metal siding, Ball stated that "numerous gaps" exist "where the siding and roof don't meet.   That's where somebody done the cutting they were not supposed to do."

{¶ 16}  Emswiler testified that she resides in Urbana but recently resided at the Ridgewood Nursing Home in Springfield, Ohio.  She stated that Barr "was supposed to build a barn up from the ground up."  She stated that there "was supposed to have been concrete poured in the post holes because that's what I had requested, and from what I seen it was never done."  She testified that she advised Barr not to put a floor in the barn

"because they were working on this pole barn in the winter months * * *. I was planning on putting a floor in in early spring."

{¶ 17} Emswiler initially testified that Bodey told her he was a licensed contractor and insured. Regarding Barr, she subsequently testified, "I hired him because he was a licensed contractor, and I didn't let [Bodey] know that. * * * I didn't [hire] [Bodey] myself because he said, well, I can't do it. I can't do the pole barn because, you know, I got to have a license. * * * So I hired Tony Barr to put the building up for his reputation, for his license, and stuff that I was being told." Emswiler stated that she had a verbal contract with Barr. She testified that Barr worked for her from early November, 2005 until the end of December, 2005, and that Bodey worked for her from August, 2005, until December 30, 2005. She stated that she considered Barr to be in charge of the barn's construction.

{¶ 18} Emswiler stated that she paid S&L Home Center $19,990.48 for the pole barn materials. She stated that she paid Bodey a total of $2,872.00, and that Panter wrote checks to him in the amount of $1,360.00, when Emswiler ran out of money, for a total of $4,232.00. She stated that she and Panter paid Joey Pena a total amount of $1,460.00 for labor on the barn, and that she paid Robbie Hoffer $1,872.50 for labor on the barn. She stated that she and Panter paid Barr $2,322.00.

{¶ 19} Emswiler stated that the barn shifted because "there's no concrete in the ground," and she stated that "nothing was level." Emswiler testified that the "roof is leaking," especially at the peak. She stated that she cannot open the overhead doors because they "were stuck many times." She stated that the service doors were "jammed," and that she cannot get into the barn.

{¶ 20} Emswiler stated that after the barn was completed, and her items were stored therein, she did not return to the pole barn until June or July of 2006, and that when she, accompanied by Lohnes, "opened the doors, we had already discovered at that time that the roof was leaking." When asked why she had not been to the barn prior to the summer of 2006, Emswiler stated that, "one thing was because of the weather. * * * And another thing of it is that I was laid up at home for approximately two, three months for a real bad upper respiratory infection and everything. I got asthma, and that had a lot to do with why I wasn't there."

{¶ 21} Emswiler stated that Ball's enumerated list, as set forth above, is accurate regarding all of the problems with the barn. Emswiler stated that Nelsh's testimony was accurate regarding the items stored in the barn and their value, and that the barn was built to store her "collectibles" and "new merchandise." Emswiler stated that water leaking into the barn from the roof destroyed the items, and a "lot of what boxes was in there were decomposing, and they were getting moldy and mildewed." She stated that "there were a few items that I had seen that were busted up, looked like people had been in there stepping all over everything, stepping on it." According to Emswiler, "people were taking things out of the barn because they knew it was worth a lot of money." She further stated that raccoons had gotten into the barn and damaged the items as well. According to Emswiler, 50 percent of the items were in "heavy duty totes," and the remaining half were in cardboard boxes. She stated that 75 percent of the items were on pallets, and what "wasn't on pallets, then I had it stacked up on heavy-duty tarps. And things like riding lawn mowers, snow blower, things like that, tools, * * * the bigger type items, they were just stored right as it

was in the pole barn."

{¶ 22}  On cross-examination, Emswiler stated that she initially stored items in her home in "thousands" of boxes, and that she "had things stored in every room from the floor almost up to the ceiling."  She stated that she began to move items into the barn from the house before the final inspection.  She testified that she moved "about two skids full of things," and that Barr and Bodey told her "don't put any more because they had to come and inspect."  Emswiler stated that she was not present for any of the inspections.  She stated that after the final inspection, she also moved items into the barn "from a warehouse that I was renting," as well as from "ten biggest storage units," to eliminate her rental expenses.  When asked how many containers of items she stored in the barn, Emswiler stated, "there's just no way that I really got the count on that because it was packed so tight and everything from the skids and the tarp onto the rafters and all the way from one end to the other end."  Emswiler stated that she intended to install a concrete floor in the barn in the spring.  She stated that she left the items in the barn and "there was so much water leaking that there was no way to do anything else.  We tarped everything, I was going to try to store this stuff somewhere else, but there's no way I'm going to store molded items and stuff that had mold and feces and stuff on it."  When asked how long it took to sort through the damaged items, Emswiler replied, "months, going into maybe couple years.  Three years."  Emswiler conceded that Panter's testimony that Emswiler has "a problem with collecting things" is "probably right."

{¶ 23}  Cole Compton testified that he is the manager of the S&L Home Center where Emswiler purchased the materials for the pole barn.  He stated that the bottom six

feet of the poles for the barn were pressure treated, and that the poles were fourteen feet tall to accommodate walls of ten feet. According to Compton, "it looks like we went up higher, all the way up on the gable ends, because we got 22 footer and 18 footers. A lot of people did that to make them stronger."

{¶ 24} On cross-examination by Bodey, Compton stated that the bottom of the posts are "square," and that the treated portion of the pole that is placed in the ground is a different color than the rest of the pole. He stated that the poles were laminated, and he described them as of "superior" quality and an "engineered product." Compton stated that "sometimes" the metal siding for the barn must be cut "where you got angles coming together. You're going to have to cut on the walls if you go all the way up to the gable ends on the walls to match the pitch of the roof. You're going to have to cut that."

{¶ 25} Bodey testified that he has been in the construction business for 35 years, and that he constructed the pole barn in November, 2005. Prior to that time, he stated that he worked for Seward, who was remodeling Emswiler's home. According to Bodey, Emswiler "dismissed" Seward and asked Bodey to construct the pole barn. Bodey stated, Emswiler "had her pole barn package on the property and it was getting late in the year. She was afraid that the material would get ruined laying out in the weather, and so she asked me about the pole barn. And I think what I told her was that the only way I would do it is if I had some qualified help to help me." Bodey stated that he contacted Barr, with whom he had worked before, for help, and that he, Barr and Emswiler "agreed to an hourly rate."

{¶ 26} Bodey stated that he obtained permits for the barn from the Champaign Health District and the Champaign County Building Department, and that a zoning permit was also

obtained. Bodey stated that he dug "around 20", 20-inch round post holes for the barn, which were filled with cement block. He testified that the holes were "about 40 inches" deep. Bodey testified that the project was inspected three times as follows: "* * * Three inspections. There's after you drill the holes, flush the concrete blocks in them, they come out and inspect the holes. Then once you get all of the rough framing up, then you call the inspector, he comes out and inspects the roof framing. Then you get the siding and roofing on and the doors in place, then you call for a final inspection." Bodey identified a cement block identical to the type he placed in the holes.

{¶ 27} Bodey stated that Jeff Siefert of the Champaign County Building Regulations inspected each of the holes and that they passed inspection. According to Bodey, Siefert "inspected the holes to make sure there was no loose material at the bottom of the holes, that concrete blocks were in there. He took a tape measure and checked. * * * He checked every hole."

{¶ 28} Regarding the second inspection, Bodey stated that Siefert "walked around inside the building, looked at all of the rough framework, and then signed off on it." Bodey also testified as follows:

> * * * We put diagonal bracing in the corners. That's not required by code, but it makes the building like super strong when you do that and ties everything together. I thought we did a nice job. I was quite proud of it. We used a laser level to set the purlins, which that makes sure that ever (sic) one of them was perfectly level.
>
> We predrilled the sheets of metal so when you stand and look down the

screw line, the screws are absolutely perfectly level and straight. When we set the trusses, we put both cable trusses up and stretch the string from one end to the other and set every truss with a small crane. We set the trusses to the string to make the building straight and square. And I don't see how you could have done any better than that.

{¶ 29} Regarding the final stage of the project and the installation of the roof, Bodey stated that he had "a little bit of a problem because the paper wrappers had been sitting out for awhile. They tend to deteriorate and they're hard to work with when they're in that condition. You know, the material was there on the job. It just shouldn't have been set out as long as it was. It's better if you can get fresh wrappers and shingles that have been stored inside." Bodey stated that he advised Emswiler, given the cold weather, that "we could have wind issues because the shingles will not be sealed down. The sun and heat seals the shingles down. It might be a maintenance issue. I told her not to be surprised if the shingles blow off in the winter, you know. That was quite possible because it's not sealed down." Bodey stated that he "laid all the shingles" for the roof himself. He stated that the barn passed the final inspection. Bodey stated that he did not put a floor in the barn, and he stated, "I talked to Marla about it's a ground freeze problem, * * * and I said we need to pour the floor right away. She said that she was running short on money and probably would wait until spring." Bodey stated that there were gaps under the doors to accommodate "three or four inches of finish gravel and four to five inches of concrete" for the floor.

{¶ 30} Bodey stated that at the time of the final inspection, "boxes full of stuff that came out of storage units" were stored in the barn. He testified that Emswiler "was not

supposed to put anything in the barn until the final inspection was done. Well, she started moving stuff in, and we asked her to stop because some building inspectors will fail you because you already occupied the building. You can't occupy the building until the final inspection was done."

{¶ 31} On cross-examination, Bodey stated he told Emswiler that he needed "qualified help" to complete the barn, and that in addition to Barr, he hired Robbie Hoffer and Joey Pena, who are "not master carpenters like [Barr] and myself, but they're competent carpenters." Bodey stated, "It surprised me that the other guy, Jack Ball, said he dug up seven poles and never found a block. I don't understand that because they're under there. And I don't know how long Jack was out there, but it would have took him days and days to dig up six poles." Bodey stated that the poles were not in the holes at the time of the first inspection, and that the concrete blocks were visible in each hole. Bodey denied being informed by Emswiler after he completed the pole barn that the roof leaked. He stated that he "told her to expect to have maintenance issues because the roof wouldn't be sealed down because of the weather conditions." Finally, in response to questions from the court, Bodey stated that the concrete block is "sixteen inches long, it's eight inches wide, and it's four inches thick. It's all solid concrete." He further indicated that the block takes up four inches of vertical space in the hole.

{¶ 32} Barr testified that he owns Barr Construction and that he has been a licensed contractor in Champaign County since 1992. Barr stated that he was the first registered contractor in Urbana. Barr stated that he did not speak to Emswiler in the course of the project other than to greet her, and that he had a verbal agreement with Bodey regarding the use of his bobcat and the construction of the barn. According to Barr, Bodey "told me this lady was in a

hardship. Her barn was on the ground. She needed to get it up before winter." In his initial visit to Emswiler's property, Barr stated that Bodey was in the process of setting the poles. The following exchange occurred:

Q. Did you observe how they were setting the poles, what materials they were using?

A. They were setting them to a string. They had the corner poles up. They had the top string at the top of the pole. They had their batter boards string at the top of the pole. They were setting them in a straight line.

Q. That's the normal installation procedure?

A. Actually, yes. That's even better than normal because he had strings at the top and the batter board string.

Q. * * * Can you tell the court what normally is in that kit that you have for a pole barn?

A. You get poles, trusses, metal, plywood, H clips, nails, two by fours for purlins - - they could be two by sixes, too. * * * This barn actually had extra headers for the garage doors. These were laminated headers, and it was all pretty much all there. And there was - - I didn't see them until it was time to, but there was also shingles out there. I think they were left over from the house or something because they had been there for a long time.

{¶ 33} Barr stated that the poles are "laminated top-of-the-line, treated at the bottom, untreated at the tip barn poles specifically built for pole barns." According to Barr, "[w]hen you laminate a post they turn the grain one way on one post, the grain the other way on the other post.

There's actually three, and they sandwiched (sic) them together and glue them in like high heat glue, which makes the post almost perfectly straight." Barr identified a photograph of the barn taken by him, in which "the truss setting header is visible," and in which "additional bracing" is visible, which Barr referred to as "overkill" in terms of stability. Barr stated that he installed two overhead doors and two service doors in the barn. The following exchange occurred:

Q. Was there any type of pad or grading that you were working with?

A. There was a rough graded pad, but it was - - it's actually there was a drop, eight inches. The back was too low. But we actually pushed the gravel on the inside to make it right. We didn't have enough gravel to do the outside.

Q. So there wasn't enough gravel that was out there?

A. No, there wasn't. Only gravel was there was there.

Q. When you were building the barn, was it your understanding that you were going to be required to put a finished floor in there to complete this job?

A. That was my understanding. That normally when you put an overhead door in you put a garage concrete floor in.

Q. And why would that be?

A. Because it won't seal if you don't put it on concrete. There's no way if you drive over the gravel with a car it's going to compact down after three or four times driving in and out. Your going to have holes in the bottom of your door even if you're just walking out. Gravel has a tendency to pack every time.

{¶ 34} Barr identified the detailed plan he used to build the barn and stated that it is a "basic plan that I've gone by for years. I picked it up at Carter Lumber years and years ago. I

build to this plan." He also identified a receipt for the headers that were installed above the overhead doors in the barn. Barr stated that he was present for the second inspection and that Seifert did not raise any concerns.

{¶ 35} Regarding the third inspection, Barr testified that the inspector "actually got a ladder and climbed up and looked around, made sure we didn't try to hide anything * * *. Said everything looked fine, all we had to do was get the floor to grade; if we were pouring concrete, call them back for another inspection later."

{¶ 36} On cross-examination, Barr stated that he did not observe Bodey place the concrete blocks in the holes, but that he observed the blocks in the holes while he was framing the building, since "we don't fill the holes in until the complete square frame is made." Barr stated that he observed Rob Hoffer cut some of the metal siding. Barr denied being approached by Emswiler about buying more gravel. On redirect examination, Barr stated that the barn was "built for a floor." He stated that at the final inspection, the inspector opened all of the doors and they were operational.

{¶ 37} On rebuttal, Emswiler stated that she observed Bodey cutting the metal siding. She stated that she informed Barr that she was willing to purchase more gravel. She stated that Bodey told her that he was a licensed contractor registered with the building regulations department, and that he was bonded and insured. She stated that Barr also told her that he was licensed and registered. She stated that Bodey and Barr were aware that she planned to wait until spring to install the concrete floor in the barn, due to a "money flow problem" and "winter weather."

{¶ 38} On April 5, 2011, Barr moved the court for a directed verdict. The trial court

overruled Barr's motion and determined that Seward was liable to Emswiler in an amount of $244,373.86 for damages to her home and in an amount of $9,788.25 for miscellaneous damages, for a total amount of $254,162.11. The court determined, due to "fraudulent actions of Defendant Seward, the violation of the Consumer Protection Sales Act, and Plaintiff's disability, Plaintiff shall receive treble damages, making the final damages against Defendant Seward $762,486.33."

{¶ 39} Regarding Bodey and Barr, the court found in relevant part as follows:

In the matter of barn construction there is considerable dispute in the testimony. The credibility of witnesses and the weight of the evidence were significant factors.

The Court finds that witnesses for Defendants were more credible than Plaintiff's witnesses.

Plaintiff may, in fact, have suffered significant losses to her items stored in the barn. However, the court believes that the evidence upholds the finding that Defendants Barr and Bodey performed reasonable workmanlike efforts and satisfied their duties in the construction.

Worth of note were the satisfactory inspections.

It is also significant that Plaintiff did not authorize completion of the barn in a manner to fully protect her stored items. The absence of a concrete floor was Plaintiff's choice. The valuation of the property loss is a moot question because Defendants Barr and Bodey were not liable for the damage. The failure to authorize proper completion of the barn was in large part caused by Plaintiff's

financial difficulties and much of that financial difficulty was related to the conduct of Defendant Seward in the house construction.

Defendants Bodey and Barr did not violate any of the claims of Plaintiff as set forth in Counts One through Fifteen. No counterclaim recovery basis has been established.

{¶ 40} Emswiler asserts one assignment of error herein as follows:

"THE TRIAL COURT'S FINDING OF NO LIABILITY ON THE PART OF APPELLEES BART BODEY AND TONY BARR WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 41} Emswiler relies upon the testimony of Billy Lohnes and Jack Ball, who "testified extensively about the poor work done in constructing the barn," as well as the testimony of Susan Panter. Emswiler enumerates "an extensive 'laundry list' of items that were wrong with the barn," consistent with Ball's testimony. According to Emswiler, every "bit as important, if not more, than all the items set forth above, was the more profound structural issues presented by the fact that Appellees did not dig the post holes properly and did not put concrete or gravel in them or metal supports at the bottom" such that "the entire structure was in danger of instability." Emswiler asserts that due to the faulty construction, "the barn was a total loss and not salvageable," and that "Ball testified that he would charge Appellant $18,500.00 to tear down the old, substandard barn, purchase new materials for new construction and pay the labor for new construction."

{¶ 42} Regarding the items that were stored in the barn, Emswiler relies upon the testimony of Nelsh "regarding vast quantities of collectibles that had been ruined in the barn due

to the faulty construction of Appellees, particularly regarding the roof."   Finally, Eswiler relies on the testimony of Jean Gaver.

{¶ 43}   This Court, in reviewing a weight of the evidence challenge, must consider the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice. *See, generally*, *State v.  Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 44}   As noted by the First District:

The Ohio Supreme Court has recently clarified and explained the standard of review to be applied when assessing the manifest weight of the evidence in a civil case.  *Eastley v. Vollman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517.   In *Eastley*, the court held that the standard of review for the manifest weight of the evidence established in [*Thompkins*] is also applicable in civil cases. *Id.* at ¶ 17-19.  Consequently, when reviewing the weight of the evidence, our analysis must determine whether the trial court's judgment was supported by the greater amount of credible evidence, and whether the plaintiff met its burden of persuasion, which is by a preponderance of the evidence.  *Id*. at ¶ 19.  We are mindful that, in a bench trial, "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."  *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). It follows that*,  *"[i]f the evidence is susceptible of more than one construction, the

reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). *SST Bearing Corporation. v. Twin City Fans Companies Limited,* 1st Dist. Hamilton No. C-110611, 2012-Ohio-2490, ¶ 16.

**{¶ 45}** Further, as this Court previously noted:

* * * While *Thompkins* explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:

Because the factfinder, be it the jury or * * * trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in *Thompkins*, *supra*, we

conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence - in short, how persuasive it is. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, unreported.

*State v. Pierre*, 2d Dist. Montgomery No. 18443, 2001 WL 220239 (March 2, 2001), * 1.

{¶ 46}    Emswiler alleged that Bodey and Barr breached their contracts with her. As this Court has previously noted:

"The essential elements of a cause of action for breach of contract are the existence of a contract, performance by the plaintiff, breach by the defendant and resulting damage to the plaintiff." * * * "A contract to perform work imposes on the contractor the duty to perform the work in a workmanlike manner. * * * "'Workmanlike manner" has been defined as the way work is customarily done by other contractors in the community.' * ** Where a contractor fails to perform in a workmanlike manner, the proper measure of damages is the cost to repair the damage to the condition contemplated by the parties as the time of the contract." * * *.    *Winner Bros., L.L.C. v. Seitz Elec., Inc.*, 182 Ohio App.3d 388, 2009-Ohio-2316, 912 N.E. 2d 1180, ¶ 31 (2d Dist.).

{¶ 47}  Emswiler alleged that Bodey and Barr committed fraud. As this court has previously determined:

"A claim for common law fraud requires proof of the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2)

which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent to misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance." * * * *Jack Turturici Family Trust v. Carey*, 196 Ohio App.3d 66, 2011-Ohio-4194, 963 N.E.2d 347, ¶ 22 (2d Dist.).

**{¶ 48}** Regarding her negligent misrepresentation claim against Bodey and Barr, this Court has previously determined:

"The elements of negligent misrepresentation are as follows: 'One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'" * * * "A negligent misrepresentation occurs when one *'supplies false information* for the guidance of others.' * * * In other words, a '[n]egligent misrepresentation does not lie for omissions; there must be some affirmative false statement. * * * .'" *Carpenter v. Long*, 196 Ohio App.3d 376, 2011-Ohio-5414, 963 N.E.2d 857, ¶ 71 (2d.Dist.).

**{¶ 49}** Regarding her negligence claim against Bodey and Barr, "'[i]t is well settled that the elements of an ordinary negligence suit are (1) the existence of a legal duty, (2) the

defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach.' * * * ." *Id.*, ¶ 115.

{¶ 50} Further, the "elements of unjust enrichment include: 1) a benefit conferred by a plaintiff upon a defendant; 2) knowledge by the defendant of the benefit; and 3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. * * *." *Harco Industries, Inc. v. Elco Textron*, *Inc*., 2d Dist. Montgomery No. 19698, 2003-Ohio-2397, ¶ 14.

{¶ 51} Emswiler alleged that Bodey and Barr violated the following provisions of the Consumer Sales Practices Act:

(A) No supplier[1] shall commit an unfair or deceptive act or practice in connection with a consumer transaction[2].   Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;

(2) That the subject of a consumer transaction is of a particular standard, quality, grade,

---

[1]"'Supplier' means a seller * * * or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer. * * * ." R.C. 1345.01(C).

[2]A "consumer" is "a person who engages in a consumer transaction with a supplier," and a "consumer transaction" means "a sale, lease, assignment, award by chance or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."   R.C. 1345.01(A),(D).

style, prescription, or model, if it is not;

* * *

(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not * * *

* * *

(7) That replacement or repair is needed, if it is not;

(8) That a specific price advantage exists, if it does not;

(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have;

* * * R.C. 1345.02.

{¶ 52} R.C. 1345.03(A) provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

{¶ 53} Finally, Emswiler asserted that Bodey and Barr negligently hired and supervised the additional workers involved in the construction of the barn. As this court has noted:

The elements of a claim for negligent hiring, supervision, and retention are (1) the existence of an employment relationship, (2) the employee's incompetence, (3) the employer's knowledge of the employee's incompetence, (4) the employee's act or omission causing the plaintiff's injuries, and (5) a causal link between the employer's negligence in hiring, supervising, and retaining and the plaintiff's injuries. * * * . *Lehrner v. Safeco Ins./Am. States. Ins. Co.*, 171

Ohio App.3d 570, 2007-Ohio-795, 872 N.E.2d 295, ¶ 42 (2d.Dist).

{¶ 54} Having thoroughly reviewed the entire record, we conclude that the trial court did not err in finding that Emswiler did not meet her burden of persuasion on her claims. The trial court specifically found that Emswiler's witnesses were less credible than the witnesses for the defense, and we defer to the trial court's assessment of witness credibility. We further note that Lohnes, Ball, Nelsh and Panter have personal relationships with Emswiler; Lohnes, Nelsh and Panter are her friends, and Ball's girlfriend and Emswiler have been friends "for years."

{¶ 55} Bodey, with 35 years of experience in the construction industry, testified that Emswiler approached him with a sense of urgency regarding construction of the barn, since the materials for its construction were exposed to the elements and it was late in the year. Bodey contacted Barr, who was a licenced contractor, to help him construct the barn. Bodey dug all of the holes for the posts himself, and he identified a concrete block identical to the ones he placed in each hole. Bodey stated that in the course of the first inspection, Seifert measured every hole and determined that there was no loose material in the bottom of any of them.

{¶ 56} Regarding the framing, according to Bodey, the barn contained "diagonal bracing" that is not required by code and that "makes the building like super strong." He further described in detail the steps taken to insure that the building was level and square.

{¶ 57} Regarding the roof, Bodey stated that the roofing materials were difficult to work with since they had been left outside for so long. Bodey advised Emswiler that it was "quite possible" that the roof would require maintenance since, in the absence of sun and heat due to the winter season, the shingles would not be properly sealed and accordingly might "blow off." Bodey stated that he also advised Emswiler that she needed to immediately install a floor, and he

stated that the absence thereof accounted for the gaps beneath the doors.

{¶ 58} Bodey's deposition is part of the record before us, and his testimony therein is consistent with his testimony at trial. At deposition, Bodey testified that he has "sided hundreds of barns," and that the moisture in the barn is not due to the improper installation of the siding. When asked if he put concrete blocks in the post holes, Bodey replied, "Every one of them, yeah. Robbie and I set all the posts, and [Emswiler's] brother was there watching us do it. He went and picked up the concrete blocks that they sit on. You put the concrete block in the bottom of the hole, you set the post in place to make sure it's straight, level, square and fill it with dirt."

{¶ 59} Barr, whose experience as a carpenter dates back to 1992, testified that the quality of the lumber used in the construction of the barn was "superior" and "top-of-the-line." He stated that the bottom of the posts were pressure treated. Barr stated that he observed concrete in the holes when he erected the framing, after the initial inspection. Barr's testimony was consistent with Bodey's regarding the use of string to ensure that the poles were level and straight. Barr's testimony regarding the additional bracing, which he referred to as "overkill," was also consistent with Bodey's. Barr also explained that the holes below the doors were due to the lack of a concrete floor, and that the barn was "built for a floor."

{¶ 60} Barr's deposition is part of the record before us, and we note that Barr testified that on the date of the final inspection, "the building inspector said them doors, if you do not put a concrete floor in there, will come off track." According to Barr's testimony at deposition, he "said, Marla, you've got to pour that floor in there. Do you want us to do it now? And she says, we don't have the money."

{¶ 61} Barr's deposition testimony also supports Bodey's testimony regarding the roof.

The following exchange occurred at Barr's deposition:

> Q. Did you have a chance to look at the roof after Mr. Bodey put it on?
>
> A. Yeah.
>
> Q. What was your opinion of the job that he did?
>
> A. Excellent for the frozen shingles he had to use that were sitting in a ditch or plowed over or knocked over. He had to straighten every stack of them that somebody out there knocked them all over with a mower. * * *
>
> Q. * * * was anything wrong with these shingles?
>
> A. They were stored outside for nine months and ran into with a bush-hog mower a couple of times, yeah. * * *

{¶ 62} Gaver's testimony that the proper permits were obtained for the barn and that the barn passed each of its inspections is consistent with Bodey's and Barr's regarding the barn's construction. Gaver did not inspect the post holes to ascertain the presence of concrete blocks therein, and in response to questions by the court, he indicated that the code at the time the barn was built did not require concrete blocks. Gaver stated that the absence of a floor would allow moisture to come up from the floor.

{¶ 63} Emswiler was aware that the absence of a concrete floor in the barn would result in gaps under the doors and jeopardize their operation, and Bodey advised her that the roof would need ongoing maintenance due to the time of year. Emswiler, by her own admission, did not visit the property for six months after the construction was completed, and she requested that Lohnes inspect the roof six months after the barn was completed.

{¶ 64} Compton's testimony refuted Ball's regarding the quality of the lumber used in

the barn and was consistent with Barr's testimony that "top-of-the -line," pressure treated poles were used. Compton's testimony further refuted Ball's testimony that the metal siding on the barn should not have been cut.

{¶ 65} Having thoroughly reviewed the entire record, it is clear that the trial court did not err in finding that the barn was constructed in a workmanlike manner by Bodey and Barr, and Emswiler's failure to install a floor, as well as her failure to maintain the roof, resulted in the damage to her property. In other words, the trial court's judgment in favor of Bodey and Barr on Emswiler's claims of breach of contract, fraud, negligent misrepresentation, negligence, unjust enrichment, negligent hiring and supervision, as well as her claims pursuant to the Consumer Sales Practices Act is not against the manifest weight of the evidence.

{¶ 66} The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

S. Todd Brecount
Cathy J. Weithman
Bart Bodey
Fred Seward
Hon. Roger B. Wilson